ORIGINAL

1
2                UNITED STATES DISTRICT COURT
3              SOUTHERN DISTRICT OF NEW YORK
4
5    ------------------------------
     LAURENCE V. RUTKOVSKY,
6
                     Plaintiff,
7
8           vs.                          Case No.:
                                         7:18-cv-5233
9                                        (VLB)(PED)
     ALLSTATE INSURANCE COMPANY,
10
                     Defendant.
11   ------------------------------
12
13
                              March 18, 2019
14                            11:04 a.m.
15        Deposition of LAURENCE V. RUTKOVSKY, taken by
16   Defendant, held at the Law Office of Craig A.
17   Blumberg, Esq., 15 Maiden Lane, New York, NY 10038,
18   pursuant to agreement, before Elizabeth F. Tobin, a
19   Registered Professional Reporter and Notary Public
20   of the State of New York.
21
22
23   JOB NO. 3249366
24
25

1

2    A P P E A R A N C E S:

3

4

5    On behalf of the Plaintiff:

6         LAW OFFICE OF CRAIG A. BLUMBERG, ESQ.

7         15 Maiden Lane, 20th Floor

8         New York, New York 10038-4003

9         212.346.0808

10        BY:    CRAIG A. BLUMBERG, ESQ.

11               cblumberg@lawofficecab.com

12

13

14

15   On behalf of the Defendant:

16        SKARZYNSKI, MARICK & BLACK, LLP

17        1 Battery Park Plaza, 32nd Floor

18        New York, New York 10004-1405

19        212.820.7700

20        BY:    THOMAS H. CELLILLI, III, ESQ.

21               tcellilli@skarzynski.com

22

23

24

25

Page 3

1
2          IT IS HEREBY STIPULATED AND AGREED
3     by and between the attorneys for the
4     respective parties herein, that filing and
5     sealing be and the same are hereby waived.
6          IT IS FURTHER STIPULATED AND AGREED
7     that all objections, except as to the form
8     of the question, shall be reserved to the
9     time of the trial.
10          IT IS FURTHER STIPULATED AND AGREED
11     that the within deposition may be sworn to
12     and signed before any officer authorized to
13     administer an oath, with the same force and
14     effect as if signed and sworn to before the
15     Court.
16
17
18               - oOo -
19
20
21
22
23
24
25

1                          L. Rutkovsky

2     L A U R E N C E   V.   R U T K O V S K Y,

3     of lawful age, called by the Defendant for

4     examination pursuant to the Federal Rules of Civil

5     Procedure, stating an address of 225 Stanley Avenue,

6     Apartment 222, Mamaroneck, New York 10543, having

7     been first duly sworn, as hereinafter certified, was

8     examined and testified as follows:

9           EXAMINATION OF LAURENCE V. RUTKOVSKY

10    BY MR. CELLILLI:

11        Q.    Good morning, Mr. Rutkovsky.

12        A.    Good morning.

13        Q.    As you know, my name is Tom Cellilli.

14    We've had occasion to meet before.  We've exchanged

15    e-mails and probably had some phone conversations,

16    too.  I'm outside counsel to Allstate Insurance

17    Company.

18          I'm going to be taking your deposition

19    today in connection with a lawsuit that you filed

20    against it that's currently pending in the United

21    States District Court for the Southern District of

22    New York, case number 7:18-CV-052333.

23          I'm going to be asking you questions

24    regarding that lawsuit and the facts concerning that

25    lawsuit so I can adequately advise my client of its

1                    L. Rutkovsky

2    obligations and its rights under the law and

3    eventually prepare this case for trial.

4              Is that your understanding as to why

5    you've been asked to be here today?

6         A.    Yes.

7         Q.    The court reporter began this deposition

8    by getting your name and current address.  You gave

9    your middle initial of V.  What does the V stand

10   for?

11        A.    Victor.

12        Q.    Have you gone by any other names other

13   than Laurence Victor Rutkovsky?

14        A.    Larry.

15        Q.    Any other names other than that?

16        A.    No.

17        Q.    How old are you?

18        A.    66.

19        Q.    What is your date of birth?

20        A.    August 2nd, 1952.

21        Q.    Have you ever had a deposition taken

22   before?

23        A.    No.

24        Q.    Let me go through a couple of ground

25   rules that hopefully will make this process a little

1                              L. Rutkovsky

2    bit easier between you and I today.  The way this

3    process works, it's a question and answer process.

4    I'll ask questions.  Hopefully you'll be able to

5    answer the questions that I do ask you.  If at any

6    point in time during the course of the deposition I

7    ask you a question that you don't understand, please

8    let me know and I'll rephrase the question for you.

9    If I ask you a question and you do answer it, I'll

10   assume that you understood the question.

11             Do you understand that?

12        A.    Yes.

13        Q.    If at any time during the course of the

14   deposition you need to take a break, please let me

15   know.  I'll gladly allow you to do that.  The only

16   thing that I would ask is if there's a question

17   pending, if you could answer the question before

18   taking the break, that would be appreciated.

19             Is that understood and agreed?

20        A.    Yes.

21        Q.    You've given an oath today to tell the

22   truth, the whole truth and nothing but the truth.

23             Do you understand the oath obligation

24   that you're under today?

25        A.    Yes.

L. Rutkovsky

1

2       Q.      Do you understand that even though we're

3   in the comforts of your lawyer's conference room

4   today, the same rules apply to oaths here as if we

5   were in the courthouse?

6       A.      Yes.

7       Q.      Our court reporter is going to take down

8   everything that's said here in the room today.  So

9   there's a couple of things you need to remember

10  about her ability to accurately record that

11  information.

12          The first is that she can only pick up

13  actual verbal responses.  Sometimes when we have a

14  discussion between us, we have a tendency to say

15  uh-uh or uh-huh.  Sometimes the court reporter

16  doesn't know exactly if it's meaning yes or no.  So

17  if my question calls for a yes or no answer, just

18  remember to answer it yes or no.

19          Is that understood and agreed?

20      A.      Yes.

21      Q.      The other thing that she has difficulty

22  doing is typing when both of us are talking at the

23  same time.  Many times you may anticipate what my

24  question is going to be before I'm able to fully

25  articulate it.  Likewise, there may be opportunities

L. Rutkovsky

2  where you start giving an answer and I start asking

3  a question on top of the answer that you're already

4  giving.

5            If you would afford me an opportunity to

6  let me finish asking my question before giving your

7  answer, I'll likewise do my best to let you finish

8  giving your answer before asking my next question.

9            Is that understood and agreed?

10       A.    Yes.

11       Q.    Are you having any physical problems

12  today that would affect your ability to understand

13  my questions or accurately respond to them?

14       A.    No.

15       Q.    Are you under the influence of any liquid

16  medication or other substance that would affect your

17  ability to understand my questions or accurately

18  respond to them?

19       A.    No.

20       Q.    I just want to start today by getting a

21  little bit of background information about you.

22            You mentioned you currently live at 225

23  Stanley Avenue in unit 222 in Mamaroneck, New York;

24  is that correct?

25       A.    Yes.

1                        L. Rutkovsky

2          Q.     Is that a condominium or co-op?

3          A.     Condominium.

4          Q.     We're going to be referring to two

5    different properties, I think, mostly today during

6    the course of this deposition.  And I'd like to try

7    to call that property the condominium.  So, whenever

8    I use the word condominium, will you understand that

9    to mean 225 Stanley Avenue, unit 222 in Mamaroneck,

10   New York?

11         A.     Yes.

12         Q.     I'm also going to use, for better or

13   worse, the term residence premises which is the

14   property that I understand was insured under an

15   Allstate Insurance Company policy.  We'll get to all

16   the specifics behind that in a minute.

17              But my understanding is that address 16

18   Glen Park Road in Westchester, New York; is that

19   right?

20         A.     No.

21         Q.     What is the address of that property?

22         A.     16 Glen Park Road, Purchase, New York

23   10577.

24         Q.     When I use the term residence premises,

25   will you understand that to mean 16 Glen Park Road

                            L. Rutkovsky

1
2   in Purchase, New York?

3        A.    I don't think so.

4        Q.    Why not?

5        A.    Why don't you say Glen Park?  Use that as

6   the referrer.

7        Q.    Great.

8              Are you married?

9        A.    Yes.

10       Q.    What is your wife's name?

11       A.    Sharon Feldman, F-E-L-D-M-A-N.

12       Q.    Does she currently live with you at the

13  condominium?

14       A.    No.

15       Q.    Where does she live?

16       A.    In Portchester, New York.

17       Q.    Whereabouts?  What's the address?

18       A.    Haines Boulevard.

19       Q.    Do you know the exact address?

20       A.    27.

21       Q.    27, you said?

22       A.    I think so.

23       Q.    27 Haines Boulevard in?

24       A.    Portchester.

25       Q.    What type of a property is that?  Is it

1                    L. Rutkovsky

2  an apartment, a private residence?

3      A.    Private residence.

4      Q.    Who's the owner of that residence?

5      A.    I don't know.

6      Q.    Does she rent it?

7      A.    I believe so.

8      Q.    Why is it she doesn't live with you at

9  225 Stanley a/k/a the condominium?

10      A.    Personal reasons.

11      Q.    Are you separated or --

12      A.    No.

13      Q.    Why are you two not living together?

14           MR. BLUMBERG:  Just so -- he's not asking

15      if you're legally separated.  He's asking if

16      you're separated.

17      A.    Yes.

18      Q.    Did she ever live with you at the

19  condominium?

20      A.    No.

21      Q.    How long she has lived at 27 Haines

22  Boulevard?

23      A.    Over a year.

24      Q.    The date of the fire in question at the

25  Glen Park property, that occurred on May 21st of

1                         L. Rutkovsky

2   2016; is that correct?

3        A.    Yes.

4        Q.    Was Ms. Feldman living with you at the

5   Glen Park property at the time of the fire?

6        A.    Yes.

7        Q.    Is Ms. Feldman your only marriage?

8        A.    No.

9        Q.    How many other marriages have you had?

10       A.    One.

11       Q.    To whom were you married and what period

12   of time were you married to that individual?

13       A.    Elinor Black.  E-L-I-N-O-R Black.

14       Q.    What years were you married to her?

15       A.    I honestly don't recall.  The eighties.

16       Q.    Do you have any children?

17       A.    Yes.

18       Q.    How many children do you have?

19       A.    One.

20       Q.    What is that child's name and age?

21       A.    Carly, C-A-R-L-Y, 21 years of age.

22       Q.    What is Carly's last name?

23       A.    Rutkovsky.

24       Q.    Where does she currently live?

25       A.    She's currently in Israel.

1                          L. Rutkovsky

2          Q.     Was she living with you at the Glen Park

3     property on May 21st of 2016?

4          A.     Yes, but she was overseas as well at that

5     point.

6          Q.     So technically speaking, she was a

7     resident --

8          A.     Yes.

9          Q.     Let me finish my question.  You're

10    anticipating my questions again.

11         A.     Sorry.

12         Q.     Not again, but for the first time.  May

13    21st of 2016 technically Carly was a resident of

14    your household at the Glen Park property but she at

15    that time was living overseas in Israel?

16         A.     Correct.

17         Q.     On May 21st of 2016 was there anybody

18    else living with you at the Glen Park residence?

19         A.     No.

20         Q.     And you mentioned that Carly is still

21    living overseas?

22         A.     Yes.  At school.

23         Q.     Can you briefly describe for me your

24    educational background?

25         A.     College degree in accounting.

Page 14

```
 1                      L. Rutkovsky
 2        Q.    Are you from the New York area
 3   originally?
 4        A.    Yes.
 5        Q.    New York State?
 6        A.    No.
 7        Q.    Whereabouts?
 8        A.    New Jersey.
 9        Q.    Did you go to high school in New Jersey?
10        A.    Yes.
11        Q.    What high school did you go to?
12        A.    Morris Hills High School.
13        Q.    What year did you graduate there?
14        A.    1970.
15        Q.    You mentioned you have a degree in
16   accounting.  Did you begin at university in 1970,
17   '71?
18        A.    Yes, I began college around that time,
19   yeah.
20        Q.    What college did you attend?
21        A.    Community College of Morris but
22   transferred to Fairleigh Dickinson University.
23        Q.    How many years were you at the Community
24   College of Morris?
25        A.    Less than a year.
```

1                    L. Rutkovsky

2        Q.     What years were you at FDU?

3        A.     Through -- I think I graduated 1977.

4        Q.     What degree did you graduate there with?

5        A.     BS accounting.

6        Q.     Any additional education beyond your BS

7    in accounting from Fairleigh Dickinson University in

8    1977?

9        A.     No.

10       Q.     We'll talk a little bit about your

11   employment history.

12              Are you currently employed?

13       A.     Yes.

14       Q.     Where are you currently employed?

15       A.     The name of my employer?

16       Q.     Yes.

17       A.     LVR Associates Limited.

18       Q.     What is your position at LVR Associates?

19       A.     President.

20       Q.     What is the nature of the business of LVR

21   Associates?

22       A.     Consulting.

23       Q.     What type of consulting?

24       A.     Professional services consulting.

25       Q.     When you say professional services, what

Page 16

L. Rutkovsky

2  type of professional services?

3     A.    Accounting firms.

4     Q.    I'm not familiar with your business at

5  all so can you describe for me what the actual

6  business would be and what consulting for

7  professional services with accountants you would be

8  doing?

9     A.    LVR Associates is a partner in the

10  consulting firm called Benson Associates,

11  B-E-N-S-O-N.  I am the managing partner of Benson

12  Associates.  Benson Associates provides advisory

13  services to accounting firms in the nature of

14  executive search.

15     Q.    So would this be like -- I don't want

16  to -- this may or may not be an insulting term, is

17  it like a head hunting service?

18     A.    Correct.

19     Q.    You're basically going out and locating

20  other professionals in the accounting area to place

21  them with other firms?

22     A.    Correct.

23     Q.    How long have you worked for LVR

24  Associates Limited?

25     A.    Sips 1989.

Page 17

L. Rutkovsky

1

2     Q.     Is that when LVR Associates Limited was

3  created?

4     A.     Yes.

5     Q.     What about Benson & Associates, did you

6  have any type of professional relationship with them

7  prior to beginning LVR Associates Limited?

8     A.     No.

9     Q.     So technically you're an employee of LVR

10 Associates?

11    A.     Yes.

12    Q.     And LVR Associates you mentioned is --

13    A.     Partner in Benson Associates.

14    Q.     So there's a partnership agreement then?

15 Well, when you use the term partner, it may not be

16 the same thing to me.  When I think about a partner,

17 I think about someone I'm a partner with in a law

18 business.  Usually there's a contractual document

19 that controls that relationship known as a

20 partnership agreement.

21    A.     Perhaps usually but not necessarily.

22    Q.     Is there any such an agreement between

23 Benson & Associates and LVR Associates?

24    A.     Nothing, really.

25    Q.     I'm sorry, you said --

1                        L. Rutkovsky

2        A.      No.

3        Q.      Have you held any other employment other

4    than at LVR Associates Limited since 1989?

5        A.      No.

6        Q.      Do you do any other type of work outside

7    of LVR Associates currently?

8        A.      No.

9        Q.      Have you done any other work outside of

10   LVR Associates since 1989?

11       A.      No.

12       Q.      You don't do any private accounting

13   services or tax returns or things like that?

14       A.      For fees?

15       Q.      Yes.

16       A.      No.

17       Q.      What have you done to prepare for your

18   deposition today?

19       A.      I've met with my attorney this morning.

20       Q.      Anything else?

21       A.      Brief conversations with friends.

22       Q.      What friends have you discussed this

23   deposition with in preparation for?

24       A.      I don't understand your question.

25       Q.      Well, you indicated to me that you've had

1                        L. Rutkovsky

2    discussions with friends in preparation for this

3    deposition and I'm wondering who those friends are.

4         A.    Eric Kreuter.

5         Q.    Anybody else?

6         A.    Richard Cohen.

7         Q.    Is it C-O-H-E-N?

8         A.    Correct.

9         Q.    Anybody else?

10        A.    No.

11        Q.    Who is Eric Kreuter?

12        A.    A friend.

13        Q.    What is Mr. Kreuter's business?

14        A.    He's an accountant.

15        Q.    When did you discuss the upcoming

16   deposition with him?

17        A.    This morning.

18        Q.    What did you discuss?

19        A.    Just briefly, we were having a deposition

20   today about this case.  More an encouragement talk.

21   Nothing in great detail really.

22        Q.    Who is Richard Cohen?

23        A.    A friend.

24        Q.    What is the nature of Mr. Cohen's

25   business?

1                      L. Rutkovsky

2        A.    He's an attorney.

3        Q.    Is he a solo practitioner or does he work

4   with a firm?

5        A.    He's retired.

6        Q.    What was the purpose of your call with

7   Mr. Cohen this morning?

8        A.    I did not have a call with Mr. Cohen this

9   morning.

10       Q.    You mentioned that you had discussed this

11  upcoming deposition with Mr. Cohen.

12             When did that conversation take place?

13       A.    Yesterday.

14       Q.    What did you and he discuss?

15       A.    Same as my conversation with Mr. Kreuter,

16  just encouragement talk and generally what's going

17  on today.

18       Q.    Have you reviewed any documents in

19  preparation for your deposition today?

20       A.    Not particularly, no.

21       Q.    When you say not particularly, what does

22  that mean?

23       A.    No.

24       Q.    You said no and not particularly.  Those

25  are really two different things.  Have you reviewed

1                        L. Rutkovsky

2    any documents in preparation?

3         A.    No.

4              MR. CELLILLI:  For housekeeping purposes,

5         we'll just mark that as Exhibit A.

6              (Defendant's Exhibit A, notice of

7         removal, summons and complaint, marked for

8         identification.)

9         Q.    The court reporter has now marked Exhibit

10   A which is a multipage document.  The first few

11   pages are the notice of removal that our office

12   filed removing the case from the Supreme Court of

13   the State of New York, County of Westchester to the

14   United States District Court for the Southern

15   District of New York.  Attached to that notice of

16   removal is the summons and complaint that was

17   originally filed in the County of Westchester,

18   Supreme Court of the State of New York.

19              Mr. Rutkovsky, have you ever seen Exhibit

20   A before?

21        A.    Yes.

22        Q.    Can you turn your attention to Exhibit A

23   of Exhibit A?  Is that a true, accurate and genuine

24   copy of the summons and complaint that you filed in

25   the Supreme Court, State of New York, County of

1                          L. Rutkovsky

2    Westchester?

3        A.    Yes.

4        Q.    You filed that proceeding in the Supreme

5    Court, State of New York, County of Westchester on

6    May 17th of 2018; is that correct?

7        A.    Yes.

8        Q.    Right before the signature, your

9    signature appears, let's go through your signature

10   page of that, please.

11            You have your signature page there now?

12       A.    Is this it?

13       Q.    Yes.  Is that a true, accurate and

14   genuine copy of your signature?

15       A.    Yes.

16       Q.    And there's some handwriting that appears

17   above that with the number $130,138.22.

18            Do you see that handwriting?

19       A.    Yes.

20       Q.    Is that your handwriting?

21       A.    Yes.

22       Q.    I'm going to begin today talking about

23   the Glen Park property.  On May 21st of 2016, who

24   was the owner of the Glen Park property?

25       A.    My wife and I.

```
1                    L. Rutkovsky
2        Q.      When you say your wife and I, you're
3    referring to Sharon Feldman?
4        A.      Correct.
5        Q.      And you?
6        A.      Correct.
7        Q.      When was it that you purchased that
8    property?
9        A.      July 1st, 1998.
10               MR. CELLILLI:   B.
11               (Defendant's Exhibit B, deed, marked
12       for identification.)
13       Q.      I've now handed you what's been marked as
14   Exhibit B.  Would you take a moment to review
15   Exhibit B and once you've had an opportunity to
16   review it, please let me know.
17       A.      Okay.
18       Q.      Is Exhibit B a true accurate and genuine
19   copy of deed of the Glen Park property where it
20   passed from Anna Nikolis, N-I-K-O-L-I-S, Baker to
21   you and Ms. Feldman?
22       A.      Yes.
23       Q.      Can you describe the Glen Park property
24   for me?
25       A.      Please be more specific.
```

Page 24

L. Rutkovsky

1
2     Q.     The Glen Park property was a one-story

3  home; is that correct?

4     A.     Yes.

5     Q.     With a low-grade garage, correct?

6     A.     Correct.

7     Q.     It had four bedrooms and three-and-a-half

8  bathrooms, correct?

9     A.     Correct.

10    Q.     That home was built in 1958, correct?

11    A.     Correct.

12    Q.     As I understand, the home on which the

13  property was situated sloped from the north to the

14  south by about eight feet; is that correct?

15    A.     Yes.

16    Q.     The original structure at the Glen Park

17  location had a below grade garage on the north side

18  of the property, correct?

19    A.     Incorrect.

20    Q.     Was it on the south side of the property?

21    A.     Yes.  You are also excluding a finished

22  basement and the semi-below grade.  The garage was

23  not below grade, it was semi-below grade.

24        MR. CELLILLI:  C.

25        (Defendant's Exhibit C, photographs,

L. Rutkovsky

1

2      Fusion 644-46, marked for identification.)

3      Q.    I have now handed you what's been marked

4  as Exhibit C.  And Exhibit C for purposes of the

5  record has Bates numbers Fusion 644 through Fusion

6  646.  And I perhaps didn't explain this to you up

7  front, Mr. Rutkovsky.

8            Just so you understand, there's a lot of

9  documents in this case, many of which particularly

10 don't pertain to the issue that's left to be

11 resolved.  So while there are a lot of documents, I

12 think the world of relevant documents is fairly

13 limited at this point.  Be that as it may, in order

14 to keep track of all the documents that had been

15 produced by either you, Allstate or any other party

16 that's been issued a subpoena in this case, we

17 assign numbers to the documents themselves, and we

18 mark those when we receive them.

19            These are documents that we actually

20 received through Fusion.  So down at the bottom of

21 the page you can see that's Fusion 644.  Do you see

22 that?

23      A.    Mm-hmm, yes.

24      Q.    Through Fusion 646.  We also mark these

25 with a letter so we can keep track of what you're

1                          L. Rutkovsky

2      actually looking at because the only way we know

3      what you're looking at on the record after it exists

4      is by referring to it by its exhibit number.  So if

5      you could remember when giving testimony about a

6      particular document, if you could make reference to,

7      not only the marked exhibit number which, in your

8      case, you're holding Exhibit C, but if you're making

9      reference to a particular page, if you could refer

10     to the page with the page number assigned.

11              For example, the second page of Exhibit C

12     is marked Fusion 645; is that correct?

13          A.    Yes.

14          Q.    I just wanted to explain that to you so

15     we don't get bogged down when talking about other

16     exhibits on the record.

17              Is that understood?

18          A.    Yes.

19          Q.    So in looking at Exhibit C, pages Fusion

20     645 and 646, can you tell me what appears on those

21     two pages of Exhibit C?

22          A.    The property known as 16 Glen Park Road.

23          Q.    Would those photographs be taken of the

24     property before or after the fire?

25          A.    Before.

1                        L. Rutkovsky

2        Q.      Do the photographs that are contained on

3   Exhibit C fairly and accurately depict the Glen Park

4   property as it existed before the fire on May 21st

5   of 2016?

6        A.      My initial answer is yes.   My

7   qualification is there are certain shrubbery or

8   vegetation that may not be -- I cannot tell you what

9   the date of these pictures are.   That's my only

10  exception.

11       Q.      I'm not as concerned about any of the

12  shrubbery, vegetation or anything like that.   I'm

13  just trying to get an idea of what the original

14  structure on the property looked like prior to May

15  21st of 2016.

16              So with that proviso that I'm giving you

17  right now, do you believe that the photographs that

18  are shown on Exhibit C fairly and accurately depict

19  what the structure looked like before May 21st of

20  2016?

21       A.      Yes.

22       Q.      Thank you.   Now, I understand that on May

23  21st of 2016 and before May 21st of 2016 there was a

24  homeowners insurance policy that covered the Glen

25  Park residence; is that correct?

Page 28

```
1                     L. Rutkovsky
2       A.     Yes.
3       Q.     And that insurance was with Allstate
4  Insurance; is that correct?
5       A.     Yes, my hesitation is there are several
6  Allstate entities, indemnity, this and that,
7  casualty.  For our purposes, I'll stipulate Allstate
8  Insurance Company is what we're referring to.
9            MR. CELLILLI:  Will you mark this?
10            (Defendant's Exhibit D, policy, AL
11       429-507, marked for identification.)
12            MR. CELLILLI:  Before you take a look at
13       that, may I just identify it for the record.
14       Just for purposes of the record, we have now
15       marked Defendant's Exhibit D which contains
16       Bates numbers AL 429 through AL 507.
17       Q.     I'm going to hand you Exhibit D.  And
18  once you've had an opportunity to review Exhibit D,
19  let me know whether or not that's a true and correct
20  copy of the policy and insurance that was in place
21  between you and Allstate Insurance Company on
22  May 21st of 2016.
23       A.     I cannot say it's a true and accurate
24  copy.
25       Q.     I'll represent to you that that's a
```

L. Rutkovsky

1

2   certified copy and it's the same certified copy that

3   I believe that I sent to you in regard to your

4   request at some point in time for a copy of the

5   policy.  Do you recall getting and receiving a

6   certified copy from me in connection with your claim

7   to Allstate?

8        A.    I do not recall whether you sent that to

9   me directly or you sent that to Eric Kreuter.  If

10  you sent it to Eric Kreuter, then it was sent to me.

11  I recognize this document, I think is your question,

12  and I do.

13       Q.    I recall reading at some point in time --

14  and I'm sure you'll correct me if I'm wrong -- that

15  at some point in time after receiving the policy you

16  went through it to make sure that it was complete

17  and inclusive; would that be fair to say?

18       A.    No.  Would you repeat the question?

19       Q.    Sure.  I just had read an e-mail or

20  something indicating that you had been going through

21  the policy to make sure that it was complete.  I

22  just want to make sure that as we sit here today

23  there's not something missing from the policy that

24  was originally sent that you thought should have

25  been there.  That's all.

Page 30

1            L. Rutkovsky

2       A.     I'm sorry.  I can't agree to that

3   question.  Try again.

4       Q.     After receiving -- did you ever receive a

5   copy of the policy during the course of your claim

6   with Allstate?

7       A.     Yes.

8       Q.     Did you --

9       A.     I --

10      Q.     Did you review the policy after receiving

11  it?

12      A.     Providing that this is a true and

13  accurate facsimile of the policy, I did receive

14  this.  I did not review this document, but I did

15  review my -- I did review --

16          MR. BLUMBERG:  Did you review the policy

17      that you had gotten?  Let's not get all caught

18      up in this.

19          THE WITNESS:  Yes.

20      Q.     I'm not trying to play any tricks here.

21  The policy is the policy.  I didn't slip anything in

22  here.  I think there's probably only a minor portion

23  of the policy that's even at issue any more, right?

24          MR. BLUMBERG:  Do you believe a document

25      that was presented to you as the policy, the

Page 31

1                        L. Rutkovsky

2          Allstate policy?

3          A.     Yes.

4          Q.     And you're aware the policy requires that

5     you either rebuild or replace the home within a

6     two-year period of time within the date of the loss,

7     correct?

8               MR. BLUMBERG:  Objection to form.  Now

9          you're summarizing a provision in the policy

10         and I don't want to get stuck with what you say

11         it says or what it actually says.  There's a

12         provision that relates to rebuilding and

13         replacement.  What are you asking him, though?

14              MR. CELLILLI:  I just asked him whether

15         or not he was aware of the fact that there's a

16         requirement under the policy that he rebuild or

17         replace the structure within a two-year period

18         from the date of the loss.

19              MR. BLUMBERG:  Do you want to show him

20         the provision that we're talking about?  I

21         don't even remember exactly what it says.

22         Q.     Do you dispute that statement?

23         A.     I can't respond until my attorney

24    completes his query.

25              MR. BLUMBERG:  Do you want to refer him

Page 32

1                    L. Rutkovsky

2         to the policy provision that you're talking

3         about?

4              MR. CELLILLI:  I really thought this was

5         a simple question.  I didn't want to get bogged

6         down.

7         A.    If you give me the policy, I can find it,

8    so...

9              MR. BLUMBERG:  I think that's a little

10        bit more of a main issue in the case.  I don't

11        think his understanding of it is really of any

12        significance.

13             MR. CELLILLI:  That's fine.  I'm not

14        going to get bogged down now and look for it.

15        When we take a break --

16             MR. BLUMBERG:  Give it to me.  I'll scan

17        through it.  You can keep asking questions.  If

18        I find it, we'll get back to it.  I'm sure it's

19        part of other -- go ahead.

20        Q.    After the fire what did you intend to do

21   with Glen Park?

22        A.    Rebuild the home.

23        Q.    What did you do in efforts to try to

24   rebuild the home?

25        A.    You'll have to be more specific.

1                    L. Rutkovsky

2       Q.     How did you begin the rebuild process?

3       A.     The first step was to achieve the

4    objective of a permitted demolition of the

5    structure.

6       Q.     I understand that was accomplished?

7       A.     Yes.

8       Q.     And the property was demolished?

9       A.     The structure was demolished.

10      Q.     Excuse me.  The structure was demolished.

11   What was the next step you took?  Let me strike that

12   and go back.

13              Did you hire anybody to assist you with

14   the demolition permit?

15      A.     Yes.

16      Q.     Who did you hire?

17      A.     I'm having trouble recollecting his name

18   and I know the guy.

19      Q.     Was it a guy or a company?

20      A.     It was a company.

21      Q.     Fusion?

22      A.     No.  The name of the company includes the

23   words tennis.  I'm sure you're familiar with it.

24      Q.     T-E-N-N-I-S?

25      A.     T-E-N-N-I-S.  The company is in the

1               L. Rutkovsky

2    business of constructing sports, including tennis

3    venues.  In that connection, they do demolition.

4    And I engaged them to do the demolition.

5         Q.    Did they assist you in actually getting

6    the demolition permit, though?

7         A.    Only in the sense of providing their

8    insurance certificates and counseling me on what

9    needed to be done.

10        Q.    Did Fusion Engineering help you at all in

11   obtaining the demolition permit?

12        A.    No.

13        Q.    At some point in time you did hire a

14   company called Fusion Engineering, correct?

15        A.    Yes.

16        Q.    Who is the person at Fusion that you

17   worked with?

18        A.    Paul Berte, B-E-R-T-E, with an accent

19   over the "E."

20        Q.    Do you recall when it was that you hired

21   Fusion Engineering?

22        A.    Early 2017 -- oh, January 2017.

23        Q.    What was the reason why you hired Fusion

24   in January 2017?

25        A.    To prepare and obtain a land development

1                          L. Rutkovsky

2    application to the town/village of Harrison.

3        Q.    Did Fusion Engineering prepare such an

4    application?

5        A.    Yes.

6        Q.    Did you hire anyone else other than

7    Fusion Engineering to assist you in the rebuild?

8        A.    Yes.

9        Q.    Who else did you hire?

10       A.    Connor Homes, Connor Mill-Built Homes.

11       Q.    Do you remember when you hired them?

12       A.    2017.

13       Q.    Let me step back with Fusion Engineering.

14   What were they actually hired to do?

15       A.    Prepare and obtain an approval for a land

16   development application.

17       Q.    Anything else?

18       A.    No.

19       Q.    Were they hired for purposes of

20   consulting with Connor Mill to develop a plan for

21   the rebuild property?

22       A.    That was all part of the land development

23   application.  Fusion was never formally engaged for

24   that.

25       Q.    Was there some type of a contract you

Page 36

1                          L. Rutkovsky
2    entered into between Fusion and yourself?
3         A.    No.
4         Q.    Was the agreement by which Fusion would
5    make this land development application for you, were
6    you paying them a set fee?  Were you paying them on
7    an hourly basis?
8         A.    Set fee.
9         Q.    What was the set fee?
10        A.    I think it was $4,000.
11        Q.    So in exchange for $4,000 they were to do
12   any type of work that was necessary in order to get
13   the land development and application fee approved?
14        A.    I don't understand your question.
15        Q.    I'm just trying to figure out exactly
16   what Fusion Engineering was scheduled to do?  You
17   say you paid them a flat fee.  Was that just for
18   purposes of filing the application?
19        A.    The land development application requires
20   a number of steps.  Those steps include siting of
21   the house, storm water management, plans, erosion
22   control plans, impact or interaction with the septic
23   system, slope considerations.  That's the best I can
24   recall.
25        Q.    Was that all part of what Fusion agreed

Page 37

1                           L. Rutkovsky
2    to do in exchange for this $4,000?
3         A.     Yes.
4         Q.     Did it also include appearing on your
5    behalf at arbitration review board meetings and
6    meeting with representatives of the town of Harrison
7    building department for the purposes of gaining
8    approval of that application.
9         A.     I don't understand your question.
10        Q.     The $4,000 fee that you paid them, did
11   that include their services in appearing at an
12   arbitration review board hearing?
13               (Witness conferred with attorney off the
14        record.)
15               MR. BLUMBERG:  Explain it.  Go ahead.
16        A.     It is not the arbitration board --
17        Q.     I apologize.  Let me rephrase it.
18               Did that also include the fee for the
19   architectural review board meeting?
20        A.     No, I think there was an additional
21   appearance fee.
22        Q.     What were the arrangements in regard to
23   things that fell outside the land development
24   application where the flat fee occurred for the
25   $4,000 where they would have to do things above and

1                    L. Rutkovsky

2  beyond that?

3       A.    I seem to recall there were two pieces.

4  One -- there was a 4,000 and a 3,000.  One might

5  have been the site survey and one is the land

6  development application.

7       Q.    As we sit here today, how much money have

8  you paid Fusion Engineering for services related to

9  the rebuild of the house?

10      A.    I think around that $7,000.

11      Q.    You mentioned you also hired Connor

12 Mill-Built Homes in about 2017 for purposes of

13 working with you on the rebuild.  Was there any type

14 of contractual agreement you entered into with

15 Connor?

16      A.    Just a design fee that I paid to him to

17 develop the plans for the house.

18      Q.    As I understand it, that was $25,000

19 nonrefundable fee that you paid to Connor for

20 purposes of developing the plans?

21      A.    Correct.

22      Q.    Did Connor ever provide you with any type

23 of a quote for the actual structure that they would

24 be building for you?

25      A.    Yes.

1                          L. Rutkovsky

2        Q.      They did so by way of a quotation; is

3    that right?

4        A.      Yes.

5        Q.      Was there ever any type of a contract

6    that was entered into for purposes of that

7    structure?

8        A.      No.

9        Q.      Why is that?

10       A.      Never got to that point.

11       Q.      Did Connor actually prepare design

12   drawings for you concerning a new structure on the

13   Glen Park property?

14       A.      Yes.

15               (Defendant's Exhibit E, cover page

16          with renderings, Fusion 607-10, marked for

17          identification.)

18               MR. CELLILLI:  For purposes of the

19          record, we've now marked Exhibit E which is

20          Fusion 607 through Fusion 610.  The witness is

21          now reviewing Exhibit E.

22       Q.      Mr. Rutkovsky, have you ever seen Exhibit

23   E before?

24       A.      I've seen the pictures.

25       Q.      So the photographs that are contained in

1                          L. Rutkovsky

2  Exhibit E are all pictures you've seen before?

3        A.    They're not photographs.   They're artist

4  renderings.

5        Q.    As far as the artist renderings that are

6  attached to Exhibit E, you have seen those before,

7  correct?

8        A.    Yes.

9        Q.    Can you tell us what those are artist

10 renderings of?

11       A.    They are early versions of the proposed

12 house.

13       Q.    When you say the proposed house, do you

14 mean the house that you intended to build at the 16

15 Glen Park property?

16       A.    The house that was the style and design

17 of the house that was considered.

18             (Defendant's Exhibit F, design

19        drawings, multipage document, marked for

20        identification.)

21             MR. CELLILLI:  For purposes of the

22        record, we've just marked Exhibit F which is a

23        multipage document.  This was actually copied

24        out of the Fusion production, but for some

25        reason when they were copied, the Bates numbers

Page 41

L. Rutkovsky

1
2    did not come off on those.  In any event, it's
3    a multipage document.
4        Q.    Have you ever seen Exhibit F before?
5        A.    Yes.
6        Q.    Can you tell us what Exhibit F is?
7        A.    A version of the proposed house.
8        Q.    Were these design drawings that were
9    prepared by Connor Mill-Built Homes?
10       A.    Yes.
11       Q.    Do you know whether or not these were the
12   drawings that were submitted to the town of Harrison
13   for a building permit approval?
14       A.    I do not.
15       Q.    Does Exhibit F fairly and accurately
16   depict the home that you intended to rebuild on the
17   Glen Park property?
18       A.    I cannot say that because I cannot read
19   the date of the version, nor can you.  It's very
20   tiny and buried in here.
21       Q.    If you look at the first page of Exhibit
22   F, does that fairly and accurately show what the
23   front elevation was intended to look like when the
24   home was rebuilt on the Glen Park property?
25       A.    Pardon me.  I don't mean to sound

1                              L. Rutkovsky

2    argumentative, but the home was not rebuilt.

3                MR. CELLILLI:   I understand that.   Could

4        you read my question back, please?

5                (Record read.)

6        Q.    Your answer is the same?

7        A.    Yes.   Your question is about a house that

8    was rebuilt.   The house was not rebuilt.

9        Q.    Does that fairly and accurately show what

10   you intended to rebuild on the Glen Park property?

11       A.    Yes.

12       Q.    If you could turn to page 6 of Exhibit F

13   and page 7 and page 7 of Exhibit F and take a moment

14   to look at pages 6 and 7 of Exhibit F.

15       A.    Which pages?

16       Q.    6 and 7.   Yes.   And the following page.

17   Do those drawings fairly and accurately depict what

18   you intended to rebuild on the Glen Park property?

19       A.    They depict the front elevation and the

20   rear elevation of the house.

21       Q.    Do they depict the front and rear

22   elevations of the house as you intended to rebuild

23   it on the Glen Park property?

24       A.    Yes.

25       Q.    The original structure that existed on

L. Rutkovsky

2  the property before May 21st of 2016, do you know

3  the livable square footage of that home?

4      A.    Over 3,000.

5      Q.    What do you base that statement on?

6      A.    The livable square feet which included

7  the finished basement.

8      Q.    Do you know whether or not the livable

9  square footage of that home was published somewhere?

10      A.    No.

11      Q.    So the number that you're giving me today

12  is based upon what?

13      A.    Simple addition of the square feet of the

14  livable area.  That was your question.

15      Q.    Right.  I'm just trying to figure out

16  where you're getting that number from.  I'm asking

17  you to show your work, show the math.

18      A.    I can't show my work right now.  I don't

19  have those calculations with me.

20      Q.    Where would you get the calculations to

21  show it?

22      A.    I have them.

23      Q.    Where would they be?

24      A.    In my files.

25      Q.    What would you be referring back to in

1                          L. Rutkovsky

2    order to make those calculations?

3         A.    An addition of the square feet of each

4    room of the house that was livable square feet.

5         Q.    What would you be referring to in order

6    to refresh your recollection as to what those square

7    footages would be?

8         A.    It would be all the square foot of the

9    house except for the garage and the workshop.

10        Q.    But I'm just trying to figure out what it

11   is you're going to actually be referring to.  Is it

12   an original plan of the home?

13        A.    No.

14        Q.    Is it a listing for the home?

15        A.    No.

16        Q.    What is it you'll be referring to?

17        A.    My only personal calculation.

18        Q.    When did you do those personal

19   calculations?

20        A.    Over the years; many, many years ago.

21        Q.    Why would you do those calculations?

22        A.    At risk of anticipating your question, I

23   believe you're referring to the 2152 square feet,

24   some number like that, that is in the original

25   plans.  That is not the true livable square feet of

1                        L. Rutkovsky

2    the home.

3         Q.    I had 2,184 square feet.

4         A.    Yeah, that's the number.

5         Q.    So you're aware of that two thousand one

6    hundred eighty --

7         A.    Yes.

8         Q.    Let me ask my question first.

9         A.    I'm sorry.

10        Q.    You're aware of those 2,184 square feet

11   that the house has been represented as having?

12        A.    The original plans would have related to

13   that number.  In real estate listings, it would have

14   related to that number.  That is not the livable

15   square feet of the house.

16        Q.    Why is that?

17        A.    Because in Westchester they don't include

18   basements in that figure.

19        Q.    So including the basement, what do you

20   believe the total square foot of livable space would

21   have been?

22        A.    In excess of 3,000.

23        Q.    How many square feet?  Is it 3,999,

24   3,100?

25        A.    Closer to 3100, 3300, somewhere around

Page 46

1                     L. Rutkovsky

2    there.  I can recreate it right now.

3             MR. BLUMBERG:  Just answer his questions.

4             THE WITNESS:  Sorry.

5        Q.    What was the square footage of the home

6    that was intended to be rebuilt on the property?

7        A.    37, 3500 square feet.  Again, whether you

8    include the garage or not, that's a...

9        Q.    In the rebuild process, was there ever

10   any discussions about changing the footprint of the

11   structure itself from the way it originally existed?

12       A.    No.  In fact, the house was sited almost

13   and virtually on the same footprint.

14       Q.    During the course of the land development

15   application, did you run into any issues?

16       A.    Such as?

17       Q.    Any issues at all.

18       A.    Yes.

19       Q.    What did you run into?

20       A.    I don't understand your question.

21       Q.    You said you ran into issues and I asked

22   what the issues were.  What don't you understand?

23       A.    There are issues of storm water

24   management.  There are issues of septic.  There are

25   issues of slope.  There are issues of the siting.

Page 47

1                              L. Rutkovsky

2    There are issues of setbacks.    Those are all the

3    issues that you're confronted with in a land

4    development application.

5         Q.    What about wetland issues?    That's one

6    you didn't mention.

7         A.    That's the brook.    That's the water

8    course.

9         Q.    Did you run into any issues there?

10        A.    Yes.

11        Q.    What were the issues you ran into?

12        A.    A setback from the brook required a

13   variance.

14        Q.    Tell me about that.

15        A.    You'll have to be more specific.

16             MR. BLUMBERG:    Just explain it to him.

17   Go ahead.

18        A.    The brook is a water course.

19        Q.    Right.

20        A.    The brook -- the water course falls under

21   the wetlands, New York State wetlands, regulations.

22   There are setbacks from the border of the brook that

23   are required to be met and if you cannot -- if you

24   cannot meet them, you have to apply for a variance

25   in order to -- a wetlands permit which is a

Page 48

1                          L. Rutkovsky

2      variance.

3           Q.      Do you know why it was that you needed to

4      seek a wetlands variance for the intended rebuild?

5           A.      Because it would have fallen within the

6      setback.

7           Q.      And why is that?

8           A.      When the house was constructed in 1958,

9      those wetland regulations did not exist.  They -- I

10     think from 1980s they were instituted.  Now it did

11     fall within that wetlands setback.

12          Q.      My understanding was in reading the

13     documents -- and you can correct me if I'm wrong --

14     is that for purposes of the rebuild the plans called

15     for, in essence, a redesign of the original

16     structure that moved the garage to the opposite side

17     of the home.

18                  Is that right?

19          A.      Yes.

20          Q.      And the garage then would be above grade,

21     correct?

22          A.      Yes.

23          Q.      So in doing so, I understand that there

24     were issues concerning the fact that a new driveway

25     needed to be constructed and that's what triggered

1                    L. Rutkovsky

2    the wetlands issue, correct?

3        A.    I don't think it triggered it, but it was

4    a factor.

5        Q.    My understanding is that -- did you work

6    with -- was the lady's name Beth Evans?

7        A.    Beth Evans is the town/village of

8    Harrison's wetland consultant.

9        Q.    Did you work with her as far as the

10   wetlands variance?

11       A.    I did not.

12       Q.    Did Fusion Engineering work with her?

13       A.    She represented the town, so they did

14   interact.

15       Q.    Has anybody ever told you that according

16   to Ms. Evans that if you never moved the driveway

17   area, you would never have had to seek a wetlands

18   variance?

19       A.    Yes.

20       Q.    The reason why you had to seek that

21   wetlands variance was because the driveway was moved

22   and that was something that you chose to do,

23   correct?

24       A.    The driveway was planned to be moved.

25       Q.    But it's something you chose to do,

```
1                        L. Rutkovsky
2    correct?
3         A.     Yes.
4         Q.     And seeking that wetlands variance caused
5    a delay in you getting the land development
6    application approved, correct?
7         A.     Yes.
8         Q.     I understand the land development
9    application wasn't even formally approved until
10   August of 2018, correct?
11        A.     That's incorrect.
12        Q.     Why is it incorrect?
13        A.     It wasn't submitted -- I'm sorry.  Say
14   that again.
15        Q.     My understanding that the land
16   development application was not even approved until
17   August 9th of 2018 due to the fact that you needed
18   to get that wetlands variance because there was a
19   choice made to move the driveway?
20        A.     That's not correct.
21        Q.     What's not correct about it?
22        A.     The land development application was not
23   approved until 2019.
24              MR. CELLILLI:  Let's mark this.
25              (Defendant's Exhibit G, 8/9/18
```

1                        L. Rutkovsky

2        letter, marked for identification.)

3                MR. CELLILLI:  Let's also mark this, too.

4                (Defendant's Exhibit H, land

5        development application, two pages, marked

6        for identification.)

7        Q.     Let's start with Exhibit G.  Can you tell

8    me what Exhibit G is?

9        A.     I don't recall seeing this document.

10       Q.     Exhibit G purports to be a letter dated

11   August 9th of 2018 from Mike Amodeo, A-M-O-D-E-O,

12   the town or village engineer, addressed to you; is

13   that correct?

14       A.     Yes.

15       Q.     Do you know Mr. Amodeo?

16       A.     Yes.

17       Q.     Have you worked with him directly with

18   regard to the intended rebuild of the structure at

19   the Glen Park property?

20       A.     I have met and spoken with him.  I can't

21   say I know him really well.

22       Q.     The first paragraph of the letter says,

23   "Please be advised that the application referenced

24   above referencing the land development application

25   for the construction of a new single-family home has

```
1                      L. Rutkovsky
2   been approved by the engineering department with the
3   following stipulations and conditions."
4           Did I read that correctly?
5       A.    Yes.
6       Q.    Did you receive a copy of Exhibit G from
7   Mr. Amodeo?
8       A.    I don't recall this.
9       Q.    Exhibit H you have in front of you, as
10  well; is that correct?
11      A.    Yes.
12      Q.    And Exhibit H is a two-page document
13  marked "land development application."
14          Do you see that?
15      A.    Yes.
16      Q.    And there is an approval signature that
17  appears on that of August 9th of 2018; is that
18  correct?
19      A.    Yes.
20      Q.    Did you ever see this exhibit before,
21  Exhibit H?
22      A.    Not with this approval on it.
23      Q.    Does this help refresh your recollection
24  as to when the land development application was
25  approved?
```

1                    L. Rutkovsky

2        A.     This is not an approval.

3        Q.     What is this?

4        A.     This is a conditional approval with the

5   stipulations and the land development application

6   was never normally approved.

7        Q.     Still to this day?

8        A.     No.

9        Q.     Why is that?

10       A.     I received a call three weeks ago, two

11  weeks ago, I believe, from Mike Amodeo's secretary

12  and the engineering department saying the land

13  development application has been approved.  And I

14  was amazed to hear this after going towards three

15  years.

16              And she said, what would you like to do

17  with all these papers?  We can leave them with the

18  Building Department.  I said, leave them with the

19  Building Department.  And I moved on.

20       Q.     Did you say anything else to her when she

21  called you?

22       A.     Not really, no.  I was --

23              MR. BLUMBERG:  Just answer his question.

24       Q.     What were you?

25       A.     Surprised.

1                        L. Rutkovsky

2        Q.      Why is that?

3        A.      It was almost three years.

4        Q.      I guess I'm a little confused about this

5    and we can hopefully maybe clear up my confusion.

6            On August 9th of 2018 it appears as

7    though a letter from the town of Harrison

8    engineering department is sent to you with an

9    approval with conditions for the construction of a

10   new single-family home with stipulations and

11   conditions.  And you mentioned to me that just three

12   weeks ago you received a call saying that this --

13   there was approval for this.  How did the

14   stipulations and conditions get resolved within that

15   period of time?

16       A.      I don't know.

17       Q.      Did this individual that called you from

18   the town of Harrison building department represent

19   to you that the land development application was

20   approved but that the stipulations and conditions

21   were no longer in place?

22       A.      The person that called me was from the

23   engineering department, not the Building Department.

24   They just simply said the land development

25   application had been approved.

1               L. Rutkovsky

2        Q.      With the stipulations and conditions or

3   without the stipulation and conditions?

4        A.      Simply that.  The land development

5   application had been approved.

6        Q.      Did you do any investigation to see

7   whether or not the stipulations and conditions were

8   still applicable?

9        A.      No.

10               THE WITNESS:  Are those my copies?

11               MR. CELLILLI:  They're all mine at this

12       point.  We'll get you copies, though.

13               Let's mark this.

14               (Defendant's Exhibit I, 9/27/17

15      e-mail and schedule, marked for

16      identification.)

17               MR. CELLILLI:  Let's go ahead and mark

18       this.

19               (Defendant's Exhibit J, copy of

20      check, marked for identification.)

21        Q.     We've now marked Exhibit I which is,

22   among other things, a September 27, 2017 e-mail

23   where Paul Berte wrote -- and that's the person

24   referred to -- there's a construction schedule

25   that's on there.

1                        L. Rutkovsky

2              Do you see that construction schedule, it

3    begins October 10th, 2017 with the arb meeting and

4    runs up until December 18th, 2017 where it says set

5    house?

6         A.    Yes.

7         Q.    Can you tell me what that e-mail is all

8    about?

9         A.    My recollection on it is not good, but it

10   appears to be setting forth a schedule.

11        Q.    Do you know what set house means?

12        A.    I think I do.

13        Q.    Can you tell me what your understanding

14   of it is?

15        A.    A critical part of the plan that was

16   considered was the construction of a panelized

17   construction home not to be confused with a modular

18   home.  Each of the panels you might think of as a

19   wall or a section of a wall.  Each of the panels is

20   manufactured at Connor's factory.  The panels are

21   trucked to the site and then the panels are set on

22   the foundation.  That's what I think is meant by set

23   house.

24        Q.    So in reading this e-mail, was it your

25   understanding that there was going to be an

1                       L. Rutkovsky

2     architectural review board meeting on October 10th

3     of 2017 and that absent any type of delays for

4     permitting issues that Connor Mill could have set

5     the house on December 18th of 2017?

6         A.     That's not correct.   Connor Mill is not

7     the builder.

8         Q.     Let me rephrase the question then.   That

9     Connor Mill could have provided to you the panels

10    where they could have been assembled by a builder on

11    December 18th of 2017?

12        A.     One more time.   I'm sorry.

13        Q.     Let me just rephrase the question.   I

14    understand.   I'm just not asking a very good

15    question here.   Just bear with me a moment.

16              It's my understanding that this is a

17    schedule that if the architectural review board met

18    on October 10th of 2017, they would have anticipated

19    that by December 18th of 2017 portions of the Connor

20    Mill prebuilt home could be delivered onsite for

21    purposes of assembly by a contractor?

22        A.     Yes.

23        Q.     Did any of the contractors that you ever

24    met with give you any idea or indication how long it

25    would take them to actually assemble the prebuilt

Page 58

L. Rutkovsky

1

2    home from Connor Mill until a certificate of

3    occupancy would be issued?

4        A.    No less than six and likely 10 months.

5        Q.    At some point in time did you begin

6    soliciting quotations from construction companies

7    locally that would be able to assist you in

8    assembling the Connor Mill built home and providing

9    any other necessary work that needed to be done; for

10   example, subcontracting trades such as plumbing?

11       A.    Yes.

12       Q.    When did you begin to start doing that?

13       A.    I don't recall.

14       Q.    Were you doing that in November of 2017?

15       A.    Likely.

16       Q.    December of 2017?

17       A.    Likely.

18       Q.    January of 2017?

19       A.    2018.

20       Q.    '18, yes, excuse me.  Thank you.

21       A.    Yes.

22       Q.    One other exhibit you have there.  Can

23   you tell us what that is?

24       A.    J.

25       Q.    Can you tell us what Exhibit J is?

1                        L. Rutkovsky

2       A.      It's a copy of my check to Connor Homes.

3       Q.      That was for the $25,000 nonrefundable

4   design drawings that they provided to you, correct?

5       A.      Correct.

6               MR. CELLILLI:  Let's mark this.

7               (Defendant's Exhibit K, e-mail with

8       attachments, Connor 465-71, marked for

9       identification.)

10      Q.      I've now given you a copy of what we've

11  marked as Exhibit K; is that correct?

12      A.      Yes.

13      Q.      It has Bates number Connor 465 through

14  471; is that correct?

15      A.      Yes.

16      Q.      Can you tell us what Exhibit K is?

17      A.      It's an e-mail from Mike Connor.  It's

18  e-mail correspondence between Mike Connor and I

19  regarding Matt Ready, R-E-A-D-Y, of Ready

20  Construction's preliminary budget for the assembly

21  and finishing of the house.  And includes two

22  variations of it; one dated March 1st, one dated

23  March 17th.  And my response to Mike whether he had

24  seen these proposals.

25      Q.      So can we agree that as of at least March

Page 60

L. Rutkovsky

1

2  22nd of 2018 it was your intention to proceed with

3  rebuilding the home?

4      A.    No.

5      Q.    Why not?

6      A.    I had since at this point decided I was

7  not going to build the home -- rebuild the home.

8      Q.    Okay.  So why on that date were you

9  sending Mike Connor an e-mail with quotes from Mike

10 Ready for purposes of rebuilding the house?

11     A.    The plan was to try to get the property

12 to a fully permitted planned property so to maximize

13 the value when I sold the property.  In other words,

14 to hand to a buyer, here are plans, here are

15 permits, here are all the approvals, just need to

16 go.  So I continued the process.

17     Q.    Well, there were plans and there were

18 permits in place at this time, correct?

19     A.    No.

20     Q.    There weren't permits in place?

21     A.    No.  What permit to which you refer?

22     Q.    The conditional permit for the land

23 development.

24     A.    The land development application is

25 simply an approval by the engineering department

Page 61

L. Rutkovsky

1

2   that, yes, you can build this house on this

3   property.  It is not the Building Department's

4   permit, that which is required to build the house.

5   It's two separate functions.

6        Q.    Did you ever convey your intention to

7   anybody else at that time?

8        A.    I don't understand your question.

9        Q.    Did you tell Mike Connor that's what you

10  intended to do?

11       A.    That I intended to do what?

12       Q.    That you intended to just get everything

13  ready so it could be sold.

14       A.    No.

15       Q.    You never told Mike Connor that?

16       A.    No, I didn't share that with him.

17       Q.    Did you share that with Mr. Berte at

18  Fusion?

19       A.    No.

20       Q.    Why didn't you tell them?

21       A.    Again, get everything done to maximize

22  the value of the property.  Around January I had

23  basically decided I was not going forward with this.

24       Q.    How would Mike Connor have affected that,

25  telling Mike Connor affected that?

Page 62

1                        L. Rutkovsky

2        A.    I don't know.

3        Q.    How would telling Mr. Berte have affected

4   that?

5        A.    I don't know.

6        Q.    What is your relationship with Mike

7   Connor?

8        A.    I haven't spoken to Mike in a while.

9        Q.    Have you ever told him that you don't

10  intend to proceed with this construction contract by

11  putting a -- let me strike that and rephrase it.

12           Did you ever tell Mr. Connor that you

13  don't intend to actually intend to purchase this

14  Connor Mill rebuilt home and rebuild on that

15  property in Glen Park?

16       A.    No.

17       Q.    Are you and Mr. Connor friends?

18       A.    Friendly.

19       Q.    What's the difference between being a

20  friend and friendly?

21       A.    I don't speak with Mike that often.  He

22  was a vendor, a potential vendor.

23       Q.    What do you mean potential vendor?

24       A.    I didn't purchase anything from him.

25       Q.    Other than the design plans?

1                           L. Rutkovsky

2      A.      Correct.

3              (Defendant's Exhibit L, e-mail

4      exchange, marked for identification.)

5      Q.      I just marked Exhibit L which is Connor

6      46, and it is an e-mail exchange between you and Mr.

7      Connor on April 19th of 2018.

8              Do you recall this e-mail exchange

9      between the two of you?

10     A.      Yes.

11     Q.      Mr. Connor, I guess, wrote to you about

12     5:57 and said that he and a few others had been

13     trying to reach out to you without success.  Is

14     everything okay.

15             And then you described having a surgical

16     procedure and that you were in intense discussions

17     with Allstate trying to deal with the May 21st, 2018

18     deadline.  What are you referring to there?

19     A.      What am I referring to by referencing the

20     May 21 deadline?

21     Q.      Yes.  What were these discussions about?

22     A.      Mike hadn't heard from me in quite a

23     while.  He was inquiring as to what was going on.  I

24     told him I was having medical problems and that at

25     the same time I was dealing with the two-year

Page 64

                         L. Rutkovsky

1

2   deadline of the Allstate Insurance policy.

3       Q.    Two-year deadline for what?

4       A.    The condition in the policy that required

5   me to repair, rebuild or replace within two years of

6   the date of loss.

7       Q.    What were you dealing with in regard to

8   the deadline when you wrote this e-mail on

9   April 19th?

10      A.    Medically?

11      Q.    No.  With Allstate.

12      A.    Discussions to seek an extension.

13      Q.    Extension for what?

14      A.    The two-year deadline.

15      Q.    For purposes of what?

16      A.    Just to relieve the pressure to make a

17  determination of what to do.

18      Q.    I thought you had already decided what to

19  do.

20      A.    The May 21 deadline required me to

21  repair, rebuild or replace Glen Park.  I had decided

22  to not rebuild and had decided to replace.  That's

23  what I was dealing with.

24      Q.    Did you communicate to Mike at that time

25  that that was your intention?

Page 65

1                     L. Rutkovsky

2        A.     No.

3        Q.     As we sit here today, other than your

4   lawyer, is there anybody else that knows about your

5   intent to replace as opposed to rebuild?

6        A.     Yes.

7        Q.     Who else?

8        A.     Eric Kreuter, Richard Cohen.

9        Q.     Anybody else?

10       A.     Various friends and relatives in passing.

11       Q.     Like who?

12       A.     I don't -- I can't recall exactly who,

13  but I don't understand your question.

14       Q.     What don't you understand about it?

15            MR. BLUMBERG:  We're not -- now you're

16       just arguing with him.  You need to know what

17       friends and family he told?

18            MR. CELLILLI:  Yeah.

19            MR. BLUMBERG:  I'm asking why.

20            MR. CELLILLI:  Why do I need to know who

21       he told his intention to?  Because I want to

22       know who he told.

23            MR. BLUMBERG:  For what reason?

24            MR. CELLILLI:  To go out and find out

25       whether he did or he didn't.

1                       L. Rutkovsky

2            MR. BLUMBERG:  Do you remember anyone

3      else?

4      A.    My cousin.

5      Q.    What's his name?

6      A.    Her name, Amy Heit.

7      Q.    How do you spell Amy's name?

8      A.    A-M-Y H-E-I-T.

9      Q.    Where does she live?

10           MR. BLUMBERG:  He's not going to give

11     that information.  It's not relevant, his

12     cousin's address.

13     Q.    When did you tell her you intended to --

14     A.    I don't recall.

15     Q.    I didn't finish the question.  When did

16 you tell her you intended to replace instead of

17 rebuild the property?

18     A.    I don't recall.

19     Q.    Why did that conversation come about?

20     A.    I was not going to replace -- rebuild the

21 house and the May 21st deadline to replace the Glen

22 Park with another property was looming.

23     Q.    What does that have to do with Amy Heit?

24     A.    She's my cousin.  I might have had a

25 conversation that I'm thinking of buying a condo.

Page 67

                        L. Rutkovsky

1

2       Q.      But you're not sure if you did or you

3  didn't?

4       A.      I didn't say that.

5       Q.      You said you might have had one.  Did I

6  mishear you or --

7              MR. BLUMBERG:  Do you have a question?

8       The question did I mishear you is not a

9       question.  What's your question?

10             MR. CELLILLI:  I thought it was a

11      question.

12             MR. BLUMBERG:  It's not a question for a

13      deposition.

14             MR. CELLILLI:  Did I mishear you?

15             MR. BLUMBERG:  What's your question?

16      What are you arguing with him for?  None of

17      this matters.  What are you arguing with him

18      for?

19             MR. CELLILLI:  Let's take a break.

20             (A recess was taken from 12:41 p.m. to

21      12:48 p.m.)

22      Q.      My understanding is that on May 1st of

23  2018 you bought the condominium; is that right?

24      A.      Yes.

25      Q.      Did you work with a realtor for purposes

1                    L. Rutkovsky

2    of obtaining that property?

3          A.    Yes.

4          Q.    Who is the realtor you dealt with?

5          A.    Coldwell Banker.

6          Q.    Was there an agent at Coldwell Banker

7    that you worked with?

8          A.    Dorthe Deubler.

9          Q.    Can you spell her name for us because I

10   know it's an odd spelling, I think.

11         A.    D-O-R-T-H-E D-U-E-B-L-E-R [sic].

12         Q.    When you purchased the condominium, was

13   that the first time you had work with Ms. Deubler?

14         A.    Yes.

15         Q.    Did you sign any agreement with Ms.

16   Deubler initially to serve as your agent for

17   purposes of acquiring a property in 2018?

18         A.    No.

19         Q.    How is it that you came to find Ms.

20   Deubler?

21         A.    She used to live in the neighborhood.

22         Q.    It's somebody you knew beforehand?

23         A.    Mm-hmm.

24         Q.    Yes?

25         A.    Yes.

Page 69

1                        L. Rutkovsky

2          Q.     Do you know when it was she began seeking

3     property for you?

4          A.     January of 2018, on or about.

5          Q.     Did you give her any type of instructions

6     when you first asked her to look for property?

7          A.     Two-bedroom, two bath condo.

8          Q.     How often do you live at the condominium

9     now?

10         A.     Every day.

11         Q.     Seven days a week?

12         A.     Yes.

13         Q.     How long has that been the case?

14         A.     Since May 10th, May 11th when work was

15     completed.  2018.

16         Q.     The Glen Park property, what is the

17     current status of that?

18         A.     The property is for sale.

19         Q.     When was the property placed for sale?

20         A.     I don't recall offhand.

21         Q.     Why did you place the property for sale?

22         A.     I have no intention to return to that

23     property to live there or build a house.

24         Q.     Is that why you placed the property for

25     sale?

1                    L. Rutkovsky

2      A.    Yes.

3      Q.    Did anybody tell you you should place the

4  property for sale?

5      A.    I don't understand your question.

6      Q.    Did anybody ever recommend to you or

7  instruct you that you should put the property up for

8  sale?

9           MR. BLUMBERG:  Don't answer anything that

10          relates to any attorney-client conversations.

11          You can answer yes or no.  You don't need to

12          say who at this point.

13     A.    No.

14     Q.    I just want to make sure I'm clear on the

15  record and I understand your answer.  Are you

16  answering that you have never had a conversation

17  with anyone -- and I'm not asking for substance of

18  the conversation.  I'm just asking you simply:  Have

19  you had a conversation with anyone who instructed

20  you to place the property for sale?

21          MR. BLUMBERG:  Don't answer that

22          question.  There are attorney-client

23          communications involved in that and that is

24          asking for substance of a conversation.  If you

25          want to ask him, did you have any conversation

L. Rutkovsky

1

2    with anyone about the sale of the property, you

3    can ask that.  As far as substance that relates

4    to attorney-client communication, he's not

5    answering that.

6         MR. CELLILLI:  I guess I'm a little

7    confused by the objection.

8         MR. BLUMBERG:  You're asking him -- first

9    you started the question with I'm not asking

10   you for the substance of a conversation but did

11   you have any conversation with anybody and then

12   you brought in -- you added something about the

13   substance of the subject -- the substance of

14   the conversation where somebody told you to do

15   something.  I'm objecting to it.  That's

16   attorney-client privilege.

17        MR. CELLILLI:  I'm not asking for the

18   substance of any conversation.  I'm just asking

19   if he's ever had any conversation with anybody

20   about placing the property for sale.

21        MR. BLUMBERG:  That's fine.  I don't have

22   a problem with that.

23        MR. CELLILLI:  Okay.

24        MR. BLUMBERG:  You can answer that, yes

25   or no.

1                    L. Rutkovsky

2      A.    Yes.

3      Q.    With whom have you had that conversation?

4            MR. BLUMBERG:   You can answer that.

5      A.    Eric Kreuter.

6      Q.    Anybody else?

7      A.    Richard Cohen.

8      Q.    Anybody else?

9      A.    I don't recall.

10     Q.    What did you discuss with Mr. Kreuter

11 about that?

12           MR. BLUMBERG:   Go ahead.

13     A.    My -- that my intention was not to

14 rebuild the house and about selling the property.

15     Q.    When did you have that conversation?

16     A.    I can't recall.

17     Q.    Did the conversation take place before

18 May 1st of 2018?

19     A.    Yes.

20     Q.    Did Mr. Kreuter ever instruct you to

21 place the property for sale?

22     A.    Mr. Kreuter has no authority to instruct

23 me about anything so I don't understand your

24 question.

25     Q.    Did Mr. Kreuter ever advise you to place

Page 73

1                    L. Rutkovsky

2    the property for sale?

3        A.    Mr. Kreuter --

4              MR. BLUMBERG:   Yes or no.

5        A.    Yes.

6        Q.    When did he do that?

7        A.    I don't recall.

8        Q.    Was it before or after you purchased the

9    condominium on May 1st of 2018?

10       A.    Before.

11       Q.    Did you follow Mr. Kreuter's advice?

12       A.    Yes.

13       Q.    When did you place the property for sale

14   then?

15       A.    September or October -- and I just don't

16   recall exactly.  But I do know that the six-month

17   agreement with Coldwell Banker was expiring, so I'm

18   trying to go back.

19       Q.    Of what year?

20       A.    '18.

21       Q.    If you had this conversation with

22   Mr. Kreuter before you purchased the condominium,

23   why did it take you so long to list the property for

24   sale?

25       A.    I would guess emotional attachment.  I've

Page 74

                          L. Rutkovsky

1
2   owned the property for 20 years.
3       Q.    You mentioned you spoke about listing the
4   property for sale with somebody else, too.  It was
5   the lawyer.  What was his name, Mr. Cohen?
6       A.    Yes.  Restate that question.
7       Q.    You indicated you also indicated talking
8   to somebody about listing the property for sale and
9   that was Mr. Cohen; is that right?
10      A.    Not about listing the property, about
11  selling the property.
12      Q.    When did you have that conversation with
13  Mr. Cohen?
14      A.    It would have been around the same time.
15      Q.    The same time as what?
16      A.    As with Mr. Kreuter, with Dorthe Deubler.
17      Q.    Which would have been when?
18      A.    I don't recall.  I'm getting confused.
19      Q.    Was it before May 1st of 2018?
20      A.    Yes.
21      Q.    What did you and Mr. Cohen discuss?
22      A.    I was not going to rebuild and go back to
23  Glen Park.  I was going to move forward, purchase a
24  condominium and go forward.
25          MR. CELLILLI:  Let's mark this.

Page 75

1                        L. Rutkovsky

2                  (Defendant's Exhibit M, Coldwell

3        Banker documents, Coldwell 1-4, marked for

4        identification.)

5        Q.      You've now been handed Exhibit M.   For

6    purposes of the record, it has Bates number Coldwell

7    1 through 4.

8              Do you recognize Exhibit M?

9        A.      Yes.

10       Q.      Can you tell us what Exhibit M is?

11       A.      The first page is detailed information

12   about the property, Coldwell 1.   Coldwell 2 through

13   4 is the listing agreement.

14       Q.      Let's talk specifically about the listing

15   agreement that appears on pages Coldwell 2 through

16   4.   That is a listing agreement whereby you listed

17   the property on August 20th of 2018; is that

18   correct?

19       A.      Yes.

20       Q.      Page 4 contains a true, accurate and

21   genuine copy of your signature, correct?

22       A.      Yes.

23       Q.      The listing agent was Ms. Deubler; is

24   that right?

25       A.      Yes.

Page 76

1                          L. Rutkovsky

2        Q.     And the listing price was $900,000,

3   correct?

4        A.     Yes.

5        Q.     And that was $900,000 for one acre of

6   property, correct?

7        A.     Correct.

8        Q.     By way of the listing agreement, you

9   refused to grant Coldwell Banker or the agent the

10  right to place a for sale property on the --

11            MR. BLUMBERG:   A for sale sign?

12            MR. CELLILLI:   Yes.

13            MR. BLUMBERG:   You said for sale

14      property.

15            MR. CELLILLI:   Sorry.   Thank you.

16       Q.     You did not grant permission for Coldwell

17  Banker or Ms. Deubler to place a for sale sign on

18  the property, correct?

19       A.     Correct.

20       Q.     Since the time of entering into this

21  agreement, have you ever granted them permission to

22  place a for sale sign on the property?

23       A.     No.

24       Q.     And the property is still for sale,

25  correct?

1                        L. Rutkovsky

2        A.      Correct.

3                MR. CELLILLI:  Mark this.

4                (Defendant's Exhibit N, extension to

5        listing agreement, marked for

6        identification.)

7        Q.      What exhibit are you looking at there?

8        A.      N.

9        Q.      Can you tell me what Exhibit N is?

10       A.      It's an extension agreement to the

11   listing agreement.

12       Q.      And that occurred in February 14th of

13   2019?

14       A.      February 18th of, 2019.

15       Q.      My apologies, I was looking at the date

16   up top, not the date it was signed.

17                So you signed Exhibit N on February 18th

18   of 2019, correct?

19       A.      Yes.

20       Q.      And was that to extend the listing

21   agreement out until April 30th of 2019?

22       A.      Yes.

23       Q.      So the listing agreement is still in

24   place, correct?

25       A.      Correct.

L. Rutkovsky

1

2   Q.    Still advertised for $900,000?

3   A.    No.

4   Q.    When did that change?

5   A.    A few weeks ago.

6   Q.    Why did it change?

7   A.    I don't understand your question.

8   Q.    Did you --

9         MR. BLUMBERG:  He's asking why.  Why did

10   the price -- go ahead.

11   Q.    The price was reduced a few weeks ago?

12   A.    Correct.

13   Q.    Why was that?

14   A.    To try to sell the property more quickly.

15   Q.    What was it reduced to?

16   A.    $799,000.

17   Q.    Did you have a discussion with anybody in

18   an effort -- strike that.

19         Did you discuss reducing the purchase

20   price of the property with anybody before lowering

21   it?

22   A.    With Dorthe Deubler.

23   Q.    Anybody else?

24   A.    No.

25         MR. CELLILLI:  Let's mark this.

1                    L. Rutkovsky

2              (Defendant's Exhibit O, e-mail

3        communication, Coldwell 439-441, marked for

4        identification.)

5        Q.     We've now marked Exhibit O which is a

6   multipage document bearing Bates number Coldwell 439

7   through 441.

8              Do you have Exhibit O in front of you?

9        A.     Yes.

10       Q.     Have you ever seen this e-mail before?

11       A.     No.

12       Q.     Whose decision was it to originally list

13   the property for $900,000?

14       A.     Mine.

15       Q.     Why is that?

16       A.     I don't understand your question.

17       Q.     Why did you decide to list it for

18   $900,000?

19       A.     How did I choose $900,000?

20       Q.     Yes.

21       A.     In about 12 or 13 years ago there was a

22   vacant piece of property adjacent to 16 Glen Park

23   Road.  That property at that point was listed for

24   $800,000.  In the neighboring town of Rye, smaller

25   properties are commonly listed for a million

Page 80

1                          L. Rutkovsky

2      dollars.  Many of those properties are what are

3      called tear downs.  A builder will buy the property,

4      tear down the house and construct a new house.  That

5      was my reference point.

6           Q.    What was the address of the property that

7      you saw across the street from 16 Glen Park -- did

8      you say it was listed or actually sold for 800,000?

9           A.    The property was adjacent to 16 Glen Park

10     at 12 Glen Park.  That was a piece of land.

11          Q.    12 years ago for 800,000?  Yes?

12          A.    Yes.

13          Q.    Exhibit O is an e-mail from Kim Rand

14     which indicates that a range of properties in and

15     around Westchester would run from 400 to 900,000

16     with the most popular price being 500,000.

17                Was that information ever communicated to

18     you?

19          A.    No, I don't know who Kim Rand is.

20          Q.    Was that information ever communicated to

21     you?

22          A.    No.

23          Q.    Other than the fact that you knew the

24     property at 12 Glen Park Road was listed some 12

25     years ago for $800,000 and that properties in Rye of

                            L. Rutkovsky

1   comparable size sold for something in that area, was

2   there anything else you based your decision to list

3   the property at $900,000 on?

4       A.    Your statement is not correct.

5       Q.    What's not correct about my statement?

6       A.    Properties of similar size.  I mentioned

7   before smaller size.

8       Q.    Anything else that you based your

9   decision on to list the property at $900,000?

10      A.    Conversations with Dorthe.  But beyond

11  that, no.

12              (Defendant's Exhibit P, e-mail,

13      Coldwell 99, marked for identification.)

14              MR. CELLILLI:  We've now marked Exhibit P

15      which is Coldwell 99.

16      Q.    Have you ever seen that document before?

17      A.    Yes.

18      Q.    Can you tell us what this document is?

19      A.    Yes.

20      Q.    What is it?

21      A.    It's an e-mail between myself and Dorthe

22  asking about the 12 Glen Park Road property.

23      Q.    Do you know why it was Ms. Deubler sent

24  you that e-mail?

1                          L. Rutkovsky

2        A.       She replied to my e-mail.

3        Q.       Why did she reply to your e-mail?

4        A.       I asked --

5                 MR. BLUMBERG:  Objection to form.  Why

6        did she reply to his e-mail?  Why are you

7        asking him why she replied?

8        Q.       Do you have an understanding why she

9    replied to your e-mail?

10                MR. BLUMBERG:  Other than replying to an

11       e-mail with a question?  I don't understand

12       your question.

13       Q.       What information was communicated to you

14   at that time?

15       A.       That the property sold for a million

16   three-ninety.

17       Q.       Did you do anything in reaction to the

18   listing of your property after receiving that

19   e-mail?

20       A.       No.

21       Q.       Why is that?

22       A.       I don't understand your question.

23       Q.       Why didn't you do anything in reaction to

24   that?

25                MR. BLUMBERG:  Objection to form.  Are

Page 83

L. Rutkovsky

2    you indicating that he should do something in

3    reaction?  I don't understand.  Are you asking

4    him why he didn't do a negative?

5        Q.    Why were you inquiring with Ms. Deubler

6    about the status of 12 Glen Park Road?

7        A.    My neighbor's house, curiosity, if

8    nothing else.

9        Q.    So, it was just curiosity?  You weren't

10   wondering what it sold for?

11       A.    I can only imagine by my question that I

12   didn't know that it had sold.  I don't understand

13   your question, Mr. Cellilli.

14       Q.    I'm just asking you why --

15       A.    I know what you're asking me.  But again,

16   I don't understand your question.  I don't

17   understand your question.

18       Q.    My question simply is why on

19   September 17th of 2018 did you reach out to Ms.

20   Deubler and ask her what the status of 12 Glen Park

21   Road was?

22       A.    It had been listed for sale for a while.

23       Q.    Why did you want to know what happened to

24   it?

25       A.    Again, my neighbor, I'm curious.

1                       L. Rutkovsky

2        Q.      When you heard that that property had

3    sold for $1.39 million, did that reaffirm your

4    belief that the $900,000 you had listed for your

5    one-acre property was the right price?

6        A.      I don't see the relevance.   I didn't make

7    that connection.    I don't understand your question,

8    Mr. Cellilli.

9        Q.      Well, you said that one of the reasons

10   why you based the listing price for one acre of your

11   property was because 12 years ago the Glen Park Road

12   property, 12 Glen Park Road, adjacent to yours was

13   listed for $800,000, right?

14       A.      Correct.

15       Q.      Which would lead me to believe that you

16   would think that whatever the value of that property

17   had would form some basis of whether or not the

18   price you set for the sale of your property was

19   appropriate?

20       A.      There's a difference between a property

21   with a house and a piece of land.   There are very

22   few pieces of land available in Purchase and as an

23   extension of that, a piece of land could be more

24   valuable without a direct correlation to the selling

25   price of a piece of property with a home on it.

```
1                    L. Rutkovsky
2    This property -- this home was also 12 years old and
3    not in great shape.
4         Q.    When you say this home, what are you
5    referring to?
6         A.    12 Glen Park Road.
7         Q.    So 12 Glen Park Road actually had a
8    structure on it?
9         A.    Yes.
10        Q.    How many bedrooms did it have?
11        A.    I don't recall.
12        Q.    Was it a five-bedroom home?
13        A.    Perhaps.
14        Q.    In excess of 4,000 square feet?
15        A.    Perhaps.
16        Q.    You're just not sure?
17        A.    I'm not sure.
18        Q.    But in any event, even though Ms. Deubler
19   conveyed this information to you at your request,
20   you didn't do anything about at that time reducing
21   the listing of the home from $900,000 to something
22   less?
23        A.    No.
24             MR. CELLILLI:  Let's take a five-minute
25        break.
```

```
1                    L. Rutkovsky
2              (A recess was taken from 1:17 p.m. to
3       1:27 p.m.)
4         Q.    I have but one question.  Have you told
5    me the truth, the whole truth and nothing about the
6    truth about all the facts and issues regarding the
7    lawsuit you're filing with Allstate?
8         A.    Yes, to the best of my recollection.
9              MR. CELLILLI:  I don't have anything
10      further.
11             (Whereupon, the proceedings were
12      adjourned at 1:28 p.m.)
13
14                    J U R A T
15
16             I do hereby certify that I have read
17      the foregoing transcript of my deposition.
18
19      _____
20             LAURENCE V. RUTKOVSKY
21
22   Sworn and subscribed before me
23   this _____ day of _____, 2019.
24   A Notary Public
25   of the State of _____
```

Page 87

L. Rutkovsky

1

2                          I N D E X

3

4    WITNESS                  EXAMINATION BY              PAGE

5    LAURENCE V.              MR. CELLILLI                  4

6    RUTKOVSKY

7

8

9                       E X H I B I T S

10

11   DEFENDANT'S   DESCRIPTION                        PAGE

12   Exhibit A     notice of removal,                  21

13                 summons and complaint

14   Exhibit B     deed                                23

15   Exhibit C     photographs, Fusion 644-46          24

16   Exhibit D     policy, AL 429-507                  28

17   Exhibit E     cover page with                     39

18                 renderings, Fusion 607-10

19   Exhibit F     design drawings,                    40

20                 multipage document

21   Exhibit G     8/9/18 letter                       50

22   Exhibit H     land development                    51

23                 application, two pages

24

25

Page 88

L. Rutkovsky

1

2        I N D E X (continued)

3

4        E X H I B I T S

5

6   DEFENDANT'S   DESCRIPTION            PAGE

7   Exhibit I     9/27/17 e-mail and      55

8               schedule

9   Exhibit J     copy of check       55

10   Exhibit K     e-mail with attachments,   59

11               Connor 465-71

12   Exhibit L     e-mail exchange      63

13   Exhibit M     Coldwell Banker       75

14               documents, Coldwell 1-4

15   Exhibit N     extension to listing    77

16               agreement

17   Exhibit O     e-mail communication,    79

18               Coldwell 439-441

19   Exhibit P     e-mail, Coldwell 99     81

20

21

22

23

24

25

Veritext Legal Solutions
www.veritext.com
212-267-6868                               516-608-2400

Page 89

1

2                        CERTIFICATE

3

4    STATE OF NEW YORK )

5                        ) ss.

6    COUNTY OF SUFFOLK)

7

8              I, Elizabeth F. Tobin, a Registered

9    Professional Reporter and Notary Public within and

10   for the State of New York, do hereby certify:

11             That Laurence V. Rutkovsky, the witness

12   whose deposition is hereinbefore set forth, was duly

13   sworn by me and that such deposition is a true

14   record of the testimony given by such witness.

15             I further certify that I am not related

16   to any of the parties to this action by blood or

17   marriage and that I am in no way interested in the

18   outcome of this matter.

19

20

21

22        ELIZABETH F. TOBIN, RPR

23

24

25

Page 90

1

2    March 18, 2019

3

4                          ERRATA

5

6    PAGE/LINE   CHANGE/REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23

24         _____

25               LAURENCE V. RUTKOVSKY

[& - 79]

### &

**&**   2:16 17:5,23

### 0

**052333**   4:22

### 1

**1**   2:17 75:7,12
**1-4**   75:3 88:14
**1.39**   84:3
**10**   58:4
**10004-1405**   2:18
**10038**   1:17
**10038-4003**   2:8
**10543**   4:6
**10577**   9:23
**10th**   56:3 57:2,18
  69:14
**11:04**   1:14
**11th**   69:14
**12**   79:21 80:10,11
  80:24,24 81:23
  83:6,20 84:11,12
  85:2,6,7
**12:41**   67:20
**12:48**   67:21
**13**   79:21
**130,138.22.**   22:17
**14th**   77:12
**15**   1:17 2:7
**16**   9:17,22,25
  26:22 40:14 79:22
  80:7,9
**17424**   89:21
**17th**   22:6 59:23
  83:19
**18**   1:13 58:20
  73:20 90:2
**18th**   56:4 57:5,11
  57:19 77:14,17
**1952**   5:20

**1958**   24:10 48:8
**1970**   14:14,16
**1977**   15:3,8
**1980s**   48:10
**1989**   16:25 18:4,10
**1998**   23:9
**19th**   63:7 64:9
**1:17**   86:2
**1:27**   86:3
**1:28**   86:12
**1st**   23:9 59:22
  67:22 72:18 73:9
  74:19

### 2

**2**   75:12,15
**2,184**   45:3,10
**20**   74:2
**2016**   12:2 13:3,13
  13:17 22:23 27:5
  27:15,20,23,23
  28:22 43:2
**2017**   34:22,22,24
  35:12 38:12 55:22
  56:3,4 57:3,5,11
  57:18,19 58:14,16
  58:18
**2018**   22:6 50:10,17
  51:11 52:17 54:6
  58:19 60:2 63:7
  63:17 67:23 68:17
  69:4,15 72:18
  73:9 74:19 75:17
  83:19
**2019**   1:13 50:23
  77:13,14,18,21
  86:23 90:2
**20th**   2:7 75:17
**21**   12:21 63:20
  64:20 87:12
**212.346.0808**   2:9

**212.820.7700**   2:19
**2152**   44:23
**21st**   11:25 13:3,13
  13:17 22:23 27:4
  27:15,19,23,23
  28:22 43:2 63:17
  66:21
**222**   4:6 8:23 9:9
**225**   4:5 8:22 9:9
  11:9
**22nd**   60:2
**23**   87:14
**24**   87:15
**25,000**   38:18 59:3
**27**   10:20,21,23
  11:21 55:22
**28**   87:16
**2nd**   5:20

### 3

**3,000**   38:4 43:4
  45:22
**3,100**   45:24
**3,999**   45:23
**30th**   77:21
**3100**   45:25
**3249366**   1:23
**32nd**   2:17
**3300**   45:25
**3500**   46:7
**37**   46:7
**39**   87:17

### 4

**4**   75:7,13,16,20
  87:5
**4,000**   36:10,11
  37:2,10,25 38:4
  85:14
**40**   87:19
**400**   80:15

**429**   28:16
**429-507**   28:11
  87:16
**439**   79:6
**439-441**   79:3
  88:18
**441**   79:7
**46**   63:6
**465**   59:13
**465-71**   59:8 88:11
**471**   59:14

### 5

**50**   87:21
**500,000**   80:16
**507**   28:16
**51**   87:22
**5233**   1:8
**55**   88:7,9
**59**   88:10
**5:57**   63:12

### 6

**6**   42:12,14,16
**607**   39:20
**607-10**   39:16
  87:18
**610**   39:20
**63**   88:12
**644**   25:5,21
**644-46**   25:2 87:15
**645**   26:12,20
**646**   25:6,24 26:20
**66**   5:18

### 7

**7**   42:13,13,14,16
**7,000**   38:10
**71**   14:17
**75**   88:13
**77**   88:15
**79**   88:17

| | | | |
|---|---|---|---|
| **799,000** 78:16 | **actual** 7:13 16:5 | **ahead** 32:19 37:15 | **appears** 22:9,16 |
| **7:18** 1:8 4:22 | 38:23 | 47:17 55:17 72:12 | 26:20 52:17 54:6 |
| **8** | **added** 71:12 | 78:10 | 56:10 75:15 |
| **8/9/18** 50:25 87:21 | **addition** 43:13 | **al** 28:10,16,16 | **applicable** 55:8 |
| **800,000** 79:24 80:8 | 44:3 | 87:16 | **application** 35:2,4 |
| 80:11,25 84:13 | **additional** 15:6 | **allow** 6:15 | 35:16,23 36:5,13 |
| **81** 88:19 | 37:20 | **allstate** 1:9 4:16 | 36:18,19 37:8,24 |
| **9** | **address** 4:5 5:8 | 9:15 25:15 28:3,6 | 38:6 46:15 47:4 |
| **9/27/17** 55:14 88:7 | 9:17,21 10:17,19 | 28:7,21 29:7 30:6 | 50:6,9,16,22 51:5 |
| **900,000** 76:2,5 | 66:12 80:6 | 31:2 63:17 64:2 | 51:23,24 52:13,24 |
| 78:2 79:13,18,19 | **addressed** 51:12 | 64:11 86:7 | 53:5,13 54:19,25 |
| 80:15 81:4,10 | **adequately** 4:25 | **amazed** 53:14 | 55:5 60:24 87:23 |
| 84:4 85:21 | **adjacent** 79:22 | **amodeo** 51:11,15 | **apply** 7:4 47:24 |
| **99** 81:14,16 88:19 | 80:9 84:12 | 52:7 | **appreciated** 6:18 |
| **9th** 50:17 51:11 | **adjourned** 86:12 | **amodeo's** 53:11 | **appropriate** 84:19 |
| 52:17 54:6 | **administer** 3:13 | **amy** 66:6,23 | **approval** 35:15 |
| **a** | **advertised** 78:2 | **amy's** 66:7 | 37:8 41:13 52:16 |
| **a.m.** 1:14 | **advice** 73:11 | **anna** 23:20 | 52:22 53:2,4 54:9 |
| **ability** 7:10 8:12 | **advise** 4:25 72:25 | **answer** 6:3,5,9,17 | 54:13 60:25 |
| 8:17 | **advised** 51:23 | 7:17,18 8:2,3,7,8 | **approvals** 60:15 |
| **able** 6:4 7:24 58:7 | **advisory** 16:12 | 27:6 42:6 46:3 | **approved** 36:13 |
| **absent** 57:3 | **affect** 8:12,16 | 53:23 70:9,11,15 | 50:6,9,16,23 52:2 |
| **accent** 34:18 | **afford** 8:5 | 70:21 71:24 72:4 | 52:25 53:6,13 |
| **accomplished** 33:6 | **age** 4:3 12:20,21 | **answering** 70:16 | 54:20,25 55:5 |
| **accountant** 19:14 | **agent** 68:6,16 | 71:5 | **april** 63:7 64:9 |
| **accountants** 16:7 | 75:23 76:9 | **anticipate** 7:23 | 77:21 |
| **accounting** 13:25 | **ago** 44:20 53:10,11 | **anticipated** 57:18 | **arb** 56:3 |
| 14:16 15:5,7 16:3 | 54:12 78:5,11 | **anticipating** 13:10 | **arbitration** 37:5 |
| 16:13,20 18:12 | 79:21 80:11,25 | 44:22 | 37:12,16 |
| **accurate** 21:23 | 84:11 | **anybody** 13:17 | **architectural** |
| 22:13 23:18 28:23 | **agree** 30:2 59:25 | 19:5,9 33:13 | 37:19 57:2,17 |
| 30:13 75:20 | **agreed** 3:2,6,10 | 49:15 61:7 65:4,9 | **area** 14:2 16:20 |
| **accurately** 7:10 | 6:19 7:19 8:9 | 70:3,6 71:11,19 | 43:14 49:17 81:2 |
| 8:13,17 27:3,18 | 36:25 | 72:6,8 78:17,20,23 | **arguing** 65:16 |
| 41:15,22 42:9,17 | **agreement** 1:18 | **apartment** 4:6 | 67:16,17 |
| **achieve** 33:3 | 17:14,20,22 36:4 | 11:2 | **argumentative** |
| **acquiring** 68:17 | 38:14 68:15 73:17 | **apologies** 77:15 | 42:2 |
| **acre** 76:5 84:5,10 | 75:13,15,16 76:8 | **apologize** 37:17 | **arrangements** |
| **action** 89:16 | 76:21 77:5,10,11 | **appearance** 37:21 | 37:22 |
| | 77:21,23 88:16 | **appearing** 37:4,11 | **articulate** 7:25 |

**artist** 40:3,5,9
**asked** 5:5 31:14
46:21 69:6 82:4
**asking** 4:23 8:2,6
8:8 11:14,15
31:13 32:17 43:16
57:14 65:19 70:17
70:18,24 71:8,9,17
71:18 78:9 81:23
82:7 83:3,14,15
**assemble** 57:25
**assembled** 57:10
**assembling** 58:8
**assembly** 57:21
59:20
**assign** 25:17
**assigned** 26:10
**assist** 33:13 34:5
35:7 58:7
**associates** 15:17
15:18,21 16:9,10
16:12,12,24 17:2,5
17:7,10,12,13,23
17:23 18:4,7,10
**assume** 6:10
**attached** 21:15
40:6
**attachment** 73:25
**attachments** 59:8
88:10
**attend** 14:20
**attention** 21:22
**attorney** 18:19
20:2 31:23 37:13
70:10,22 71:4,16
**attorneys** 3:3
**august** 5:20 50:10
50:17 51:11 52:17
54:6 75:17
**authority** 72:22

**authorized** 3:12
**available** 84:22
**avenue** 4:5 8:23
9:9
**aware** 31:4,15
45:5,10

**b**

**b** 16:11 23:10,11
23:14,15,18 34:18
68:11 87:9,14
88:4
**back** 32:18 33:12
35:13 42:4 43:25
73:18 74:22
**background** 8:21
13:24
**baker** 23:20
**banker** 68:5,6
73:17 75:3 76:9
76:17 88:13
**base** 43:5
**based** 43:12 81:3,9
84:10
**basement** 24:22
43:7 45:19
**basements** 45:18
**basically** 16:19
61:23
**basis** 36:7 84:17
**bates** 25:5 28:16
40:25 59:13 75:6
79:6
**bath** 69:7
**bathrooms** 24:8
**battery** 2:17
**bear** 57:15
**bearing** 79:6
**bedroom** 69:7
85:12
**bedrooms** 24:7
85:10

**began** 5:7 14:18
69:2
**beginning** 17:7
**begins** 56:3
**behalf** 2:5,15 37:5
**belief** 84:4
**believe** 11:7 27:17
29:3 30:24 44:23
45:20 53:11 84:15
**benson** 16:10,11
16:12 17:5,13,23
**berte** 34:18 55:23
61:17 62:3
**best** 8:7 36:23 86:8
**beth** 49:6,7
**better** 9:12
**beyond** 15:6 38:2
81:11
**birth** 5:19
**bit** 6:2 8:21 15:10
32:10
**black** 2:16 12:13
12:13
**blood** 89:16
**blumberg** 1:17 2:6
2:10 11:14 30:16
30:24 31:8,19,25
32:9,16 37:15
46:3 47:16 53:23
65:15,19,23 66:2
66:10 67:7,12,15
70:9,21 71:8,21,24
72:4,12 73:4
76:11,13 78:9
82:5,10,25
**board** 37:5,12,16
37:19 57:2,17
**bogged** 26:15 32:5
32:14
**border** 47:22

**bottom** 25:20
**bought** 67:23
**boulevard** 10:18
10:23 11:22
**break** 6:14,18
32:15 67:19 85:25
**brief** 18:21
**briefly** 13:23
19:19
**brook** 47:7,12,18
47:20,22
**brought** 71:12
**bs** 15:5,6
**budget** 59:20
**build** 40:14 60:7
61:2,4 69:23
**builder** 57:7,10
80:3
**building** 37:7
38:24 41:13 53:18
53:19 54:18,23
61:3
**built** 24:10 35:10
38:12 41:9 58:8
**buried** 41:20
**business** 15:20
16:4,6 17:18
19:13,25 34:2
**buy** 80:3
**buyer** 60:14
**buying** 66:25

**c**

**c** 2:2 4:2 12:21
19:7 24:24,25
25:4,4 26:8,11,19
26:21 27:3,18
87:15
**calculation** 44:17
**calculations** 43:19
43:20 44:2,19,21

**call** 9:7 20:6,8
  53:10 54:12
**called** 4:3 16:10
  34:14 48:14 53:21
  54:17,22 80:3
**calls** 7:17
**carly** 12:21 13:13
  13:20
**carly's** 12:22
**case** 1:8 4:22 5:3
  19:20 21:12 25:9
  25:16 26:8 32:10
  69:13
**casualty** 28:7
**caught** 30:17
**caused** 50:4
**cblumberg** 2:11
**cellilli** 2:20 4:10
  4:13 21:4 23:10
  24:24 28:9,12
  31:14 32:4,13
  39:18 40:21 42:3
  50:24 51:3 55:11
  55:17 59:6 65:18
  65:20,24 67:10,14
  67:19 71:6,17,23
  74:25 76:12,15
  77:3 78:25 81:15
  83:13 84:8 85:24
  86:9 87:5
**certain** 27:7
**certificate** 58:2
  89:2
**certificates** 34:8
**certified** 4:7 29:2
  29:2,6
**certify** 86:16
  89:10,15
**change** 78:4,6 90:6
**changing** 46:10

**check** 55:20 59:2
  88:9
**child's** 12:20
**children** 12:16,18
**choice** 50:19
**choose** 79:19
**chose** 49:22,25
**civil** 4:4
**claim** 29:6 30:5
**clear** 54:5 70:14
**client** 4:25 70:10
  70:22 71:4,16
**closer** 45:25
**cohen** 19:6,22 20:7
  20:8,11 65:8 72:7
  74:5,9,13,21
**cohen's** 19:24
**coldwell** 68:5,6
  73:17 75:2,3,6,12
  75:12,15 76:9,16
  79:3,6 81:14,16
  88:13,14,18,19
**college** 13:25
  14:18,20,21,24
**come** 41:2 66:19
**comforts** 7:3
**commonly** 79:25
**communicate**
  64:24
**communicated**
  80:17,20 82:13
**communication**
  71:4 79:3 88:17
**communications**
  70:23
**community** 14:21
  14:23
**companies** 58:6
**company** 1:9 4:17
  9:15 28:8,21
  33:19,20,22,25

34:14
**comparable** 81:2
**complaint** 21:7,16
  21:24 87:13
**complete** 29:16,21
**completed** 69:15
**completes** 31:24
**concerned** 27:11
**concerning** 4:24
  39:12 48:24
**condition** 64:4
**conditional** 53:4
  60:22
**conditions** 52:3
  54:9,11,14,20 55:2
  55:3,7
**condo** 66:25 69:7
**condominium** 9:2
  9:3,7,8 10:13 11:9
  11:19 67:23 68:12
  69:8 73:9,22
  74:24
**conference** 7:3
**conferred** 37:13
**confronted** 47:3
**confused** 54:4
  56:17 71:7 74:18
**confusion** 54:5
**connection** 4:19
  29:6 34:3 84:7
**connor** 35:10,10
  35:20 38:11,15,19
  38:22 39:11 41:9
  57:4,6,9,19 58:2,8
  59:2,8,13,17,18
  60:9 61:9,15,24,25
  62:7,12,14,17 63:5
  63:7,11 88:11
**connor's** 56:20
**considerations**
  36:23

**considered** 40:17
  56:16
**construct** 80:4
**constructed** 48:8
  48:25
**constructing** 34:2
**construction**
  51:25 54:9 55:24
  56:2,16,17 58:6
  62:10
**construction's**
  59:20
**consultant** 49:8
**consulting** 15:22
  15:23,24 16:6,10
  35:20
**contained** 27:2
  39:25
**contains** 28:15
  75:20
**continued** 60:16
  88:2
**contract** 35:25
  39:5 62:10
**contractor** 57:21
**contractors** 57:23
**contractual** 17:18
  38:14
**control** 36:22
**controls** 17:19
**conversation**
  20:12,15 66:19,25
  70:16,18,19,24,25
  71:10,11,14,18,19
  72:3,15,17 73:21
  74:12
**conversations**
  4:15 18:21 70:10
  81:11
**convey** 61:6

[conveyed - discussion]                                                    Page 5

| | | | |
|---|---|---|---|
| conveyed  85:19 | courthouse  7:5 | decided  60:6 | description  87:11 |
| copied  40:23,25 | cousin  66:4,24 | 61:23 64:18,21,22 | 88:6 |
| copies  55:10,12 | cousin's  66:12 | decision  79:12 | design  38:16 39:11 |
| copy  21:24 22:14 | cover  39:15 87:17 | 81:3,10 | 40:16,18 41:8 |
| 23:19 28:20,24 | covered  27:24 | deed  23:11,19 | 59:4 62:25 87:19 |
| 29:2,2,4,6 30:5 | craig  1:16 2:6,10 | 87:14 | detail  19:21 |
| 52:6 55:19 59:2 | created  17:3 | defendant  1:10,16 | detailed  75:11 |
| 59:10 75:21 88:9 | critical  56:15 | 2:15 4:3 | determination |
| correct  8:24 12:2 | curiosity  83:7,9 | defendant's  21:6 | 64:17 |
| 13:16 16:18,22 | curious  83:25 | 23:11 24:25 28:10 | deubler  68:8,13,16 |
| 19:8 22:6 23:4,6 | current  5:8 69:17 | 28:15 39:15 40:18 | 68:20 74:16 75:23 |
| 24:3,5,6,8,9,10,11 | currently  4:20 | 50:25 51:4 55:14 | 76:17 78:22 81:24 |
| 24:14,18 26:12 | 8:22 10:12 12:24 | 55:19 59:7 63:3 | 83:5,20 85:18 |
| 27:25 28:4,19 | 12:25 15:12,14 | 75:2 77:4 79:2 | develop  35:20 |
| 29:14 31:7 34:14 | 18:7 | 81:13 87:11 88:6 | 38:17 |
| 38:21 40:7 48:13 | cv  1:8 4:22 | degree  13:25 | developing  38:20 |
| 48:21 49:2,23 | | 14:15 15:4 | development |
| 50:2,6,10,20,21 | **d** | delay  50:5 | 34:25 35:16,22 |
| 51:13 52:10,18 | | delays  57:3 | 36:5,13,19 37:23 |
| 57:6 59:4,5,11,14 | d  10:11 28:10,15 | delivered  57:20 | 38:6 46:14 47:4 |
| 60:18 63:2 75:18 | 28:17,18 51:11 | demolished  33:8,9 | 50:5,8,16,22 51:5 |
| 75:21 76:3,6,7,18 | 59:19 68:11,11 | 33:10 | 51:24 52:13,24 |
| 76:19,25 77:2,18 | 87:2,16 88:2 | demolition  33:4 | 53:5,13 54:19,24 |
| 77:24,25 78:12 | date  5:19 11:24 | 33:14 34:3,4,6,11 | 55:4 60:23,24 |
| 81:5,6 84:14 | 27:9 31:6,18 | department  37:7 | 87:22 |
| correctly  52:4 | 41:19 60:8 64:6 | 52:2 53:12,18,19 | dickinson  14:22 |
| correlation  84:24 | 77:15,16 | 54:8,18,23,23 | 15:7 |
| correspondence | dated  51:10 59:22 | 60:25 | difference  62:19 |
| 59:18 | 59:22 | department's  61:3 | 84:20 |
| counsel  4:16 | day  53:7 69:10 | depict  27:3,18 | different  9:5 20:25 |
| counseling  34:8 | 86:23 | 41:16 42:17,19,21 | difficulty  7:21 |
| county  21:13,17 | days  69:11 | deposition  1:15 | direct  84:24 |
| 21:25 22:5 89:6 | deadline  63:18,20 | 3:11 4:18 5:7,21 | directly  29:9 |
| couple  5:24 7:9 | 64:2,3,8,14,20 | 6:6,14 9:6 18:18 | 51:17 |
| course  6:6,13 9:6 | 66:21 | 18:23 19:3,16,19 | discuss  19:15,18 |
| 30:5 46:14 47:8 | deal  63:17 | 20:11,19 67:13 | 20:14 72:10 74:21 |
| 47:18,20 | dealing  63:25 64:7 | 86:17 89:12,13 | 78:19 |
| court  1:2 3:15 | 64:23 | describe  13:23 | discussed  18:22 |
| 4:21 5:7 7:7,15 | dealt  68:4 | 16:5 23:23 | 20:10 |
| 21:9,12,14,18,25 | december  56:4 | described  63:15 | discussion  7:14 |
| 22:5 | 57:5,11,19 58:16 | | 78:17 |
| | decide  79:17 | | |

**discussions** 19:2
46:10 63:16,21
64:12
**dispute** 31:22
**district** 1:2,3 4:21
4:21 21:14,15
**document** 17:18
21:10 26:6 29:11
30:14,24 40:19,23
41:3 51:9 52:12
79:6 81:17,19
87:20
**documents** 20:18
21:2 25:9,11,12,14
25:17,19 48:13
75:3 88:14
**doing** 7:22 16:8
48:23 58:12,14
**dollars** 80:2
**dorthe** 68:8 74:16
78:22 81:11,22
**downs** 80:3
**drawings** 39:12
40:19 41:8,12
42:17 59:4 87:19
**driveway** 48:24
49:16,21,24 50:19
**due** 50:17
**duly** 4:7 89:12

**e**

**e** 2:2,2 4:2,2,15
10:11 12:13 16:11
19:7 29:19 33:24
33:25 34:18,18,19
39:15,19,21,23
40:2,6 51:11
55:15,22 56:7,24
59:7,17,18,19 60:9
63:3,6,8 64:8 66:8
68:11,11,11 79:2
79:10 80:13 81:13

81:22,25 82:2,3,6
82:9,11,19 87:2,9
87:17 88:2,4,7,10
88:12,17,19
**early** 34:22 40:11
**easier** 6:2
**education** 15:6
**educational** 13:24
**effect** 3:14
**effort** 78:18
**efforts** 32:23
**eight** 24:14
**eighties** 12:15
**eighty** 45:6
**either** 25:15 31:5
**elevation** 41:23
42:19,20
**elevations** 42:22
**elinor** 12:13
**elizabeth** 1:18
89:8,22
**emotional** 73:25
**employed** 15:12
15:14
**employee** 17:9
**employer** 15:15
**employment** 15:11
18:3
**encouragement**
19:20 20:16
**engaged** 34:4
35:23
**engineer** 51:12
**engineering** 34:10
34:14,21 35:3,7,13
36:16 38:8 49:12
52:2 53:12 54:8
54:23 60:25
**entered** 36:2 38:14
39:6

**entering** 76:20
**entities** 28:6
**eric** 19:4,11 29:9
29:10 65:8 72:5
**erosion** 36:21
**errata** 90:4
**esq** 1:17 2:6,10,20
**essence** 48:15
**estate** 45:13
**evans** 49:6,7,16
**event** 41:2 85:18
**eventually** 5:3
**exact** 10:19
**exactly** 7:16 31:21
36:15 65:12 73:16
**examination** 4:4,9
87:4
**examined** 4:8
**example** 26:11
58:10
**exception** 27:10
**excess** 45:22 85:14
**exchange** 36:11
37:2 63:4,6,8
88:12
**exchanged** 4:14
**excluding** 24:21
**excuse** 33:10
58:20
**executive** 16:4
**exhibit** 21:5,6,9,19
21:22,23 23:11,14
23:15,18 24:25
25:4,4 26:4,7,8,11
26:19,21 27:3,18
28:10,15,17,18
39:15,19,21,22
40:2,6,18,22 41:4
41:6,15,21 42:12
42:13,14 50:25
51:4,7,8,10 52:6,9

52:12,20,21 55:14
55:19,21 58:22,25
59:7,11,16 63:3,5
75:2,5,8,10 77:4,7
77:9,17 79:2,5,8
80:13 81:13,15
87:12,14,15,16,17
87:19,21,22 88:7,9
88:10,12,13,15,17
88:19
**exhibits** 26:16
**exist** 48:9
**existed** 27:4 42:25
46:11
**exists** 26:3
**expiring** 73:17
**explain** 25:6 26:14
37:15 47:16
**extend** 77:20
**extension** 64:12,13
77:4,10 84:23
88:15

**f**

**f** 1:18 10:11 40:18
40:22 41:4,6,15,22
42:12,13,14 87:19
89:8,22
**facsimile** 30:13
**fact** 31:15 46:12
48:24 50:17 80:23
**factor** 49:4
**factory** 56:20
**facts** 4:24 86:6
**fair** 29:17
**fairleigh** 14:22
15:7
**fairly** 25:12 27:3
27:18 41:15,22
42:9,17
**fall** 48:11

[fallen - hand]                                                    Page 7

**fallen**  48:5
**falls**  47:20
**familiar**  16:4
   33:23
**family**  51:25 54:10
   65:17
**far**  40:5 49:9 71:3
**fdu**  15:2
**february**  77:12,14
   77:17
**federal**  4:4
**fee**  36:6,8,9,13,17
   37:10,18,21,24
   38:16,19
**fees**  18:14
**feet**  24:14 43:6,13
   44:3,4,23,25 45:3
   45:10,15,23 46:7
   85:14
**feldman**  10:11
   12:4,7 23:3,21
**fell**  37:23
**figure**  36:15 43:15
   44:10 45:18
**filed**  4:19 21:12,17
   21:24 22:4
**files**  43:24
**filing**  3:4 36:18
   86:7
**find**  32:7,18 65:24
   68:19
**fine**  32:13 71:21
**finish**  8:6,7 13:9
   66:15
**finished**  24:21
   43:7
**finishing**  59:21
**fire**  11:24 12:5
   26:24 27:4 32:20
**firm**  16:10 20:4

**firms**  16:3,13,21
**first**  4:7 7:12
   13:12 21:10 33:3
   41:21 45:8 51:22
   68:13 69:6 71:8
   75:11
**five**  85:12,24
**flat**  36:17 37:24
**floor**  2:7,17
**follow**  73:11
**following**  42:16
   52:3
**follows**  4:8
**foot**  44:8 45:20
**footage**  43:3,9
   46:5
**footages**  44:7
**footprint**  46:10,13
**force**  3:13
**foregoing**  86:17
**form**  3:7 31:8 82:5
   82:25 84:17
**formally**  35:23
   50:9
**forth**  56:10 89:12
**forward**  61:23
   74:23,24
**foundation**  56:22
**four**  24:7
**friend**  19:12,23
   62:20
**friendly**  62:18,20
**friends**  18:21,22
   19:2,3 62:17
   65:10,17
**front**  25:7 41:23
   42:19,21 52:9
   79:8
**fully**  7:24 60:12
**functions**  61:5

**further**  3:6,10
   86:10 89:15
**fusion**  25:2,5,5,20
   25:21,24 26:12,19
   33:21 34:10,14,16
   34:21,23 35:3,7,13
   35:23 36:2,4,16,25
   38:8 39:16,20,20
   40:24 49:12 61:18
   87:15,18

**g**

**g**  50:25 51:7,8,10
   52:6 87:21
**gaining**  37:7
**garage**  24:5,17,22
   44:9 46:8 48:16
   48:20
**generally**  20:16
**genuine**  21:23
   22:14 23:18 75:21
**getting**  5:8 8:20
   29:5 34:5 43:16
   50:5 74:18
**give**  32:7,16 57:24
   66:10 69:5
**given**  6:21 59:10
   89:14
**giving**  8:2,4,6,8
   26:5 27:16 43:11
**gladly**  6:15
**glen**  9:18,22,25
   10:5 11:25 12:5
   13:2,14,18 22:23
   22:24 23:19,23
   24:2,16 26:22
   27:3,24 32:21
   39:13 40:15 41:17
   41:24 42:10,18,23
   51:19 62:15 64:21
   66:21 69:16 74:23
   79:22 80:7,9,10,24

   81:23 83:6,20
   84:11,12 85:6,7
**go**  5:24 14:9,11
   22:9 32:19 33:12
   37:15 47:17 55:17
   60:16 65:24 72:12
   73:18 74:22,24
   78:10
**going**  4:18,23 7:7
   7:24 9:4,12 16:19
   20:16 22:22 28:17
   29:20 32:14 44:11
   53:14 56:25 60:7
   61:23 63:23 66:10
   66:20 74:22,23
**good**  4:11,12 56:9
   57:14
**gotten**  30:17
**grade**  24:5,17,22
   24:23,23 48:20
**graduate**  14:13
   15:4
**graduated**  15:3
**grant**  76:9,16
**granted**  76:21
**great**  10:7 19:21
   85:3
**ground**  5:24
**guess**  54:4 63:11
   71:6 73:25
**guy**  33:18,19

**h**

**h**  2:20 19:7 51:4
   52:9,12,21 66:8
   68:11 87:9,22
   88:4
**haines**  10:18,23
   11:21
**half**  24:7
**hand**  28:17 60:14

**handed** 23:13 25:3 75:5
**handwriting** 22:16,18,20
**happened** 83:23
**harrison** 35:2 37:6 41:12 54:7,18
**harrison's** 49:8
**head** 16:17
**hear** 53:14
**heard** 63:22 84:2
**hearing** 37:12
**heit** 66:6,23
**held** 1:16 18:3
**help** 34:10 52:23
**hereinafter** 4:7
**hereinbefore** 89:12
**hesitation** 28:5
**high** 14:9,11,12
**hills** 14:12
**hire** 33:13,16 34:13 35:6,9
**hired** 34:20,23 35:11,14,19 38:11
**history** 15:11
**hmm** 25:23 68:23
**holding** 26:8
**home** 24:3,10,12 31:5 32:22,24 41:16,24 42:2 43:3,9 44:12,14 45:2 46:5 48:17 51:25 54:10 56:17 56:18 57:20 58:2 58:8 60:3,7,7 62:14 84:25 85:2 85:4,12,21
**homeowners** 27:24

**homes** 35:10,10 38:12 41:9 59:2
**honestly** 12:15
**hopefully** 5:25 6:4 54:5
**hourly** 36:7
**house** 36:21 38:9 38:17 40:12,13,14 40:16,17 41:7 42:7,8,20,22 44:4 44:9 45:11,15 46:12 48:8 56:5 56:11,23 57:5 59:21 60:10 61:2 61:4 66:21 69:23 72:14 80:4,4 83:7 84:21
**household** 13:14
**housekeeping** 21:4
**huh** 7:15
**hundred** 45:6
**hunting** 16:17

**i**

**idea** 27:13 57:24
**identification** 21:8 23:12 25:2 28:11 39:17 40:20 51:2 51:6 55:16,20 59:9 63:4 75:4 77:6 79:4 81:14
**identify** 28:13
**iii** 2:20
**imagine** 83:11
**impact** 36:22
**include** 36:20 37:4 37:11,18 45:17 46:8
**included** 43:6
**includes** 33:22 59:21

**including** 34:2 45:19
**inclusive** 29:17
**incorrect** 24:19 50:11,12
**indemnity** 28:6
**indicated** 18:25 74:7,7
**indicates** 80:14
**indicating** 29:20 83:2
**indication** 57:24
**individual** 12:12 54:17
**influence** 8:15
**information** 7:11 8:21 66:11 75:11 80:17,20 82:13 85:19
**initial** 5:9 27:6
**initially** 68:16
**inquiring** 63:23 83:5
**instituted** 48:10
**instruct** 70:7 72:20,22
**instructed** 70:19
**instructions** 69:5
**insulting** 16:16
**insurance** 1:9 4:16 9:15 27:24 28:3,4 28:8,20,21 34:8 64:2
**insured** 9:14
**intend** 32:20 62:10 62:13,13
**intended** 40:14 41:16,23 42:10,18 42:22 46:6 48:4 51:18 61:10,11,12 66:13,16

**intense** 63:16
**intent** 65:5
**intention** 60:2 61:6 64:25 65:21 69:22 72:13
**interact** 49:14
**interaction** 36:22
**interested** 89:17
**investigation** 55:6
**involved** 70:23
**israel** 12:25 13:15
**issue** 25:10 30:23 32:10 49:2
**issued** 25:16 58:3
**issues** 46:15,17,21 46:22,23,24,25,25 47:2,3,5,9,11 48:24 57:4 86:6

**j**

**j** 55:19 58:24,25 86:14 88:9
**january** 34:22,24 58:18 61:22 69:4
**jersey** 14:8,9
**job** 1:23
**july** 23:9

**k**

**k** 4:2,2 11:9 23:20 59:7,11,16 88:10
**keep** 25:14,25 32:17
**kim** 80:13,19
**knew** 68:22 80:23
**know** 4:13 6:8,15 7:16 10:19 11:5 23:16 26:2 28:19 33:18 41:11 43:2 43:8 48:3 51:15 51:21 54:16 56:11 62:2,5 65:16,20,22

68:10 69:2 73:16
80:19 81:24 83:12
83:15,23
**known** 17:19
26:22
**knows** 65:4
**kreuter** 19:4,11
20:15 29:9,10
65:8 72:5,10,20,22
72:25 73:3,22
74:16
**kreuter's** 19:13
73:11

**l**

**l** 4:1,2 5:1 6:1 7:1
8:1 9:1 10:1,11
11:1 12:1,13,21
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1,20 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1,3,5
64:1 65:1 66:1
67:1 68:1,11 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1

85:1 86:1 87:1
88:1,12
**lady's** 49:6
**land** 34:25 35:15
35:22 36:5,13,19
37:23 38:5 46:14
47:3 50:5,8,15,22
51:4,24 52:13,24
53:5,12 54:19,24
55:4 60:22,24
80:10 84:21,22,23
87:22
**lane** 1:17 2:7
**larry** 5:14
**laurence** 1:5,15
4:9 5:13 86:20
87:5 89:11 90:25
**law** 1:16 2:6 5:2
17:17
**lawful** 4:3
**lawofficecab.com**
2:11
**lawsuit** 4:19,24,25
86:7
**lawyer** 65:4 74:5
**lawyer's** 7:3
**lead** 84:15
**leave** 53:17,18
**left** 25:10
**legally** 11:15
**letter** 25:25 51:2
51:10,22 54:7
87:21
**likewise** 7:25 8:7
**limited** 15:17
16:24 17:2,7 18:4
25:13
**line** 90:6
**liquid** 8:15
**list** 73:23 79:12,17
81:3,10

**listed** 75:16 79:23
79:25 80:8,24
83:22 84:4,13
**listing** 44:14 74:3
74:8,10 75:13,14
75:16,23 76:2,8
77:5,11,20,23
82:18 84:10 85:21
88:15
**listings** 45:13
**little** 5:25 8:21
15:10 32:9 54:4
71:6
**livable** 43:3,6,8,14
44:4,25 45:14,20
**live** 8:22 10:12,15
11:8,18 12:24
66:9 68:21 69:8
69:23
**lived** 11:21
**living** 11:13 12:4
13:2,15,18,21
**llp** 2:16
**locally** 58:7
**locating** 16:19
**location** 24:17
**long** 11:21 16:23
57:24 69:13 73:23
**longer** 54:21
**look** 28:12 32:14
41:21,23 42:14
69:6
**looked** 27:14,19
**looking** 26:2,3,19
77:7,15
**looming** 66:22
**loss** 31:6,18 64:6
**lot** 25:8,11
**low** 24:5
**lowering** 78:20

**lvr** 15:17,18,20
16:9,23 17:2,7,9
17:12,23 18:4,7,10

**m**

**m** 10:11 51:11
66:8 75:2,5,8,10
88:13
**maiden** 1:17 2:7
**mail** 29:19 55:15
55:22 56:7,24
59:7,17,18 60:9
63:3,6,8 64:8 79:2
79:10 80:13 81:13
81:22,25 82:2,3,6
82:9,11,19 88:7,10
88:12,17,19
**mails** 4:15
**main** 32:10
**making** 26:8
**mamaroneck** 4:6
8:23 9:9
**management**
36:21 46:24
**managing** 16:11
**manufactured**
56:20
**march** 1:13 59:22
59:23,25 90:2
**marick** 2:16
**mark** 21:5 25:18
25:24 28:9 50:24
51:3 55:13,17
59:6 74:25 77:3
78:25
**marked** 21:7,9
23:11,13 25:2,3
26:7,12 28:11,15
39:16,19 40:19,22
51:2,5 52:13
55:15,20,21 59:8
59:11 63:4,5 75:3

77:5 79:3,5 81:14
81:15
marriage 12:7
89:17
marriages 12:9
married 10:8
12:11,12,14
math 43:17
matt 59:19
matter 89:18
matters 67:17
maximize 60:12
61:21
mean 9:9,25 20:22
40:14 41:25 62:23
meaning 7:16
means 56:11
meant 56:22
medical 63:24
medically 64:10
medication 8:16
meet 4:14 47:24
meeting 37:6,19
56:3 57:2
meetings 37:5
mention 47:6
mentioned 8:22
13:20 14:15 17:12
20:10 38:11 54:11
74:3 81:7
met 18:19 47:23
51:20 57:17,24
middle 5:9
mike 51:11 53:11
59:17,18,23 60:9,9
61:9,15,24,25 62:6
62:8,21 63:22
64:24
mill 35:10,20
38:12 41:9 57:4,6
57:9,20 58:2,8

62:14
million 79:25
82:15 84:3
mine 55:11 79:14
minor 30:22
minute 9:16 85:24
mishear 67:6,8,14
missing 29:23
mm 25:23 68:23
modular 56:17
moment 23:14
42:13 57:15
money 38:7
month 73:16
months 58:4
morning 4:11,12
18:19 19:17 20:7
20:9
morris 14:12,21
14:24
move 50:19 74:23
moved 48:16
49:16,21,24 53:19
multipage 21:10
40:19,23 41:3
79:6 87:20

**n**

n 2:2 4:2 10:11
12:13 16:11,11
19:7 23:20 33:24
33:24,25,25 77:4,8
77:9,17 87:2 88:2
88:15
name 4:13 5:8
10:10 12:20,22
15:15 33:17,22
49:6 66:5,6,7 68:9
74:5
names 5:12,15
nature 15:20
16:13 19:24

necessarily 17:21
necessary 36:12
58:9
need 6:14 7:9
60:15 65:16,20
70:11
needed 34:9 48:3
48:25 50:17 58:9
negative 83:4
neighbor 83:25
neighbor's 83:7
neighborhood
68:21
neighboring 79:24
never 35:23 39:10
49:16,17 53:6
61:15 70:16
new 1:3,17,20 2:8
2:8,18,18 4:6,22
8:23 9:10,18,22
10:2,16 14:2,5,8,9
21:13,15,18,25
22:5 39:12 47:21
48:24 51:25 54:10
80:4 89:4,10
nikolis 23:20
ninety 82:16
nonrefundable
38:19 59:3
normally 53:6
north 24:13,17
notary 1:19 86:24
89:9
notice 21:6,11,15
87:12
november 58:14
number 4:22
22:17 26:4,7,10
36:20 43:11,16
44:24 45:4,13,14
59:13 75:6 79:6

numbers 25:5,17
28:16 40:25
ny 1:17

**o**

o 4:2 12:13 16:11
19:7 23:20 51:11
51:11 68:11 79:2
79:5,8 80:13
88:17
oath 3:13 6:21,23
oaths 7:4
objecting 71:15
objection 31:8
71:7 82:5,25
objections 3:7
objective 33:4
obligation 6:23
obligations 5:2
obtain 34:25 35:15
obtaining 34:11
68:2
occasion 4:14
occupancy 58:3
occurred 11:25
37:24 77:12
october 56:3 57:2
57:18 73:15
odd 68:10
offhand 69:20
office 1:16 2:6
21:11
officer 3:12
oh 34:22
okay 23:17 60:8
63:14 71:23
old 5:17 85:2
once 23:15 28:18
onsite 57:20
ooo 3:18
op 9:2

[opportunities - price]

**opportunities** 7:25
**opportunity** 8:5
23:15 28:18
**opposed** 65:5
**opposite** 48:16
**order** 25:13 36:12
44:2,5 47:25
**original** 24:16
27:13 42:25 44:12
44:24 45:12 48:15
**originally** 14:3
21:17 29:24 46:11
79:12
**outcome** 89:18
**outside** 4:16 18:6
18:9 37:23
**overseas** 13:4,15
13:21
**owned** 74:2
**owner** 11:4 22:24

**p**

**p** 2:2,2 81:13,15
88:19
**p.m.** 67:20,21 86:2
86:3,12
**page** 22:10,11
25:21 26:9,10,10
26:11 39:15 41:21
42:12,13,13,16
52:12 75:11,20
87:4,11,17 88:6
90:6
**pages** 21:11 26:19
26:21 42:14,15
51:5 75:15 87:23
**paid** 36:17 37:10
38:8,16,19
**panelized** 56:16
**panels** 56:18,19,20
56:21 57:9

**papers** 53:17
**paragraph** 51:22
**pardon** 41:25
**park** 2:17 9:18,22
9:25 10:5 11:25
12:5 13:2,14,18
22:23,24 23:19,23
24:2,16 26:22
27:3,25 32:21
39:13 40:15 41:17
41:24 42:10,18,23
51:19 62:15 64:21
66:22 69:16 74:23
79:22 80:7,9,10,24
81:23 83:6,20
84:11,12 85:6,7
**part** 32:19 35:22
36:25 56:15
**particular** 26:6,9
**particularly** 20:20
20:21,24 25:9
**parties** 3:4 89:16
**partner** 16:9,11
17:13,15,16,17
**partnership** 17:14
17:20
**party** 25:15
**passed** 23:20
**passing** 65:10
**paul** 34:18 55:23
**paying** 36:6,6
**ped** 1:9
**pending** 4:20 6:17
**period** 12:11 31:6
31:17 54:15
**permission** 76:16
76:21
**permit** 33:14 34:6
34:11 41:13 47:25
60:21,22 61:4

**permits** 60:15,18
60:20
**permitted** 33:4
60:12
**permitting** 57:4
**person** 34:16
54:22 55:23
**personal** 11:10
44:17,18
**pertain** 25:10
**phone** 4:15
**photographs**
24:25 26:23 27:2
27:17 39:25 40:3
87:15
**physical** 8:11
**pick** 7:12
**pictures** 27:9
39:24 40:2
**piece** 79:22 80:10
84:21,23,25
**pieces** 38:3 84:22
**place** 16:20 20:12
28:20 54:21 60:18
60:20 69:21 70:3
70:20 72:17,21,25
73:13 76:10,17,22
77:24
**placed** 69:19,24
**placing** 71:20
**plaintiff** 1:6 2:5
**plan** 35:20 44:12
56:15 60:11
**planned** 49:24
60:12
**plans** 36:21,22
38:17,20 44:25
45:12 48:14 60:14
60:17 62:25
**play** 30:20

**plaza** 2:17
**please** 6:7,14
22:10 23:16,25
42:4 51:23
**plumbing** 58:10
**point** 6:6 13:5
25:13 29:4,13,15
34:13 39:10 55:12
58:5 60:6 70:12
79:23 80:5
**policy** 9:15 27:24
28:10,20 29:5,15
29:21,23 30:5,10
30:13,16,21,21,23
30:25 31:2,4,9,16
32:2,7 64:2,4
87:16
**popular** 80:16
**portchester** 10:16
10:24
**portion** 30:22
**portions** 57:19
**position** 15:18
**potential** 62:22,23
**practitioner** 20:3
**prebuilt** 57:20,25
**preliminary** 59:20
**premises** 9:13,24
**preparation** 18:23
19:2 20:19 21:2
**prepare** 5:3 18:17
34:25 35:3,15
39:11
**prepared** 41:9
**presented** 30:25
**president** 15:19
**pressure** 64:16
**price** 76:2 78:10
78:11,20 80:16
84:5,10,18,25

**prior**  17:7 27:14
**private**  11:2,3
  18:12
**privilege**  71:16
**probably**  4:15
  30:22
**problem**  71:22
**problems**  8:11
  63:24
**procedure**  4:5
  63:16
**proceed**  60:2
  62:10
**proceeding**  22:4
**proceedings**  86:11
**process**  5:25 6:3,3
  33:2 46:9 60:16
**produced**  25:15
**production**  40:24
**professional**  1:19
  15:24,25 16:2,7
  17:6 89:9
**professionals**
  16:20
**properties**  9:5
  79:25 80:2,14,25
  81:7
**property**  9:7,14
  9:21 10:25 11:25
  12:5 13:3,14
  22:23,24 23:8,19
  23:23 24:2,13,18
  24:20 26:22,24
  27:4,14 33:8
  35:21 39:13 40:15
  41:17,24 42:10,18
  42:23 43:2 46:6
  51:19 60:11,12,13
  61:3,22 62:15
  66:17,22 68:2,17
  69:3,6,16,18,19,21

69:23,24 70:4,7,20
  71:2,20 72:14,21
  73:2,13,23 74:2,4
  74:8,10,11 75:12
  75:17 76:6,10,14
  76:18,22,24 78:14
  78:20 79:13,22,23
  80:3,6,9,24 81:4
  81:10,23 82:15,18
  84:2,5,11,12,16,18
  84:20,25 85:2
**proposals**  59:24
**proposed**  40:11,13
  41:7
**provide**  38:22
**provided**  57:9
  59:4
**provides**  16:12
**providing**  30:12
  34:7 58:8
**provision**  31:9,12
  31:20 32:2
**proviso**  27:16
**public**  1:19 86:24
  89:9
**published**  43:9
**purchase**  9:22
  10:2 62:13,24
  74:23 78:19 84:22
**purchased**  23:7
  68:12 73:8,22
**purports**  51:10
**purpose**  20:6
**purposes**  21:4
  25:4 28:7,14
  35:19 36:18 37:7
  38:12,20 39:6,18
  40:21 48:14 57:21
  60:10 64:15 67:25
  68:17 75:6

**pursuant**  1:18 4:4
**put**  70:7
**putting**  62:11

**q**

**qualification**  27:7
**query**  31:24
**question**  3:8 6:3,7
  6:8,9,10,16,17
  7:17,24 8:3,6,8
  11:24 13:9 18:24
  29:11,18 30:3
  32:5 36:14 37:9
  42:4,7 43:14
  44:22 45:8 46:20
  53:23 57:8,13,15
  61:8 65:13 66:15
  67:7,8,9,9,11,12
  67:15 70:5,22
  71:9 72:24 74:6
  78:7 79:16 82:11
  82:12,22 83:11,13
  83:16,17,18 84:7
  86:4
**questions**  4:23 6:4
  6:5 8:13,17 13:10
  32:17 46:3
**quickly**  78:14
**quite**  63:22
**quotation**  39:2
**quotations**  58:6
**quote**  38:23
**quotes**  60:9

**r**

**r**  2:2 4:2,2 12:13
  12:21 34:18 59:19
  68:11,11 86:14
**ran**  46:21 47:11
**rand**  80:13,19
**range**  80:14

**reach**  63:13 83:19
**reaction**  82:17,23
  83:3
**read**  29:19 41:18
  42:4,5 52:4 86:16
**reading**  29:13
  48:12 56:24
**ready**  59:19,19
  60:10 61:13
**reaffirm**  84:3
**real**  45:13
**really**  17:24 19:21
  20:25 32:4,11
  51:21 53:22
**realtor**  67:25 68:4
**rear**  42:20,21
**reason**  34:23
  40:25 49:20 65:23
  90:6
**reasons**  11:10 84:9
**rebuild**  31:5,16
  32:22,24 33:2
  35:7,21 38:9,13
  41:16 42:10,18,22
  46:9 48:4,14
  51:18 60:7 62:14
  64:5,21,22 65:5
  66:17,20 72:14
  74:22
**rebuilding**  31:12
  60:3,10
**rebuilt**  41:24 42:2
  42:8,8 46:6 62:14
**recall**  12:15 29:5,8
  29:13 34:20 36:24
  38:3 51:9 52:8
  58:13 63:8 65:12
  66:14,18 69:20
  72:9,16 73:7,16
  74:18 85:11

**receive** 25:18 30:4
  30:13 52:6
**received** 25:20
  53:10 54:12
**receiving** 29:5,15
  30:4,10 82:18
**recess** 67:20 86:2
**recognize** 29:11
  75:8
**recollecting** 33:17
**recollection** 44:6
  52:23 56:9 86:8
**recommend** 70:6
**record** 7:10 25:5
  26:3,16 28:13,14
  37:14 39:19 40:22
  42:5 70:15 75:6
  89:14
**recreate** 46:2
**redesign** 48:15
**reduced** 78:11,15
**reducing** 78:19
  85:20
**refer** 26:9 31:25
  60:21
**reference** 26:6,9
  80:5
**referenced** 51:23
**referencing** 51:24
  63:19
**referred** 55:24
**referrer** 10:6
**referring** 9:4 23:3
  26:4 28:8 43:25
  44:5,11,16,23
  63:18,19 85:5
**refresh** 44:6 52:23
**refused** 76:9
**regard** 29:3 37:22
  51:18 64:7

**regarding** 4:24
  59:19 86:6
**registered** 1:19
  89:8
**regulations** 47:21
  48:9
**related** 38:8 45:12
  45:14 89:15
**relates** 31:12
  70:10 71:3
**relationship** 17:6
  17:19 62:6
**relatives** 65:10
**relevance** 84:6
**relevant** 25:12
  66:11
**relieve** 64:16
**remember** 7:9,18
  26:5 31:21 35:11
  66:2
**removal** 21:7,11
  21:16 87:12
**removing** 21:12
**renderings** 39:16
  40:4,5,10 87:18
**rent** 11:6
**repair** 64:5,21
**repeat** 29:18
**rephrase** 6:8
  37:17 57:8,13
  62:11
**replace** 31:5,17
  64:5,21,22 65:5
  66:16,20,21
**replacement** 31:13
**replied** 82:2,7,9
**reply** 82:3,6
**replying** 82:10
**reporter** 1:19 5:7
  7:7,15 21:9 89:9

**represent** 28:25
  54:18
**representatives**
  37:6
**represented** 45:11
  49:13
**request** 29:4 85:19
**required** 47:12,23
  61:4 64:4,20
**requirement**
  31:16
**requires** 31:4
  36:19
**reserved** 3:8
**residence** 9:13,24
  11:2,3,4 13:18
  27:25
**resident** 13:7,13
**resolved** 25:11
  54:14
**respective** 3:4
**respond** 8:13,18
  31:23
**response** 59:23
**responses** 7:13
**restate** 74:6
**retired** 20:5
**return** 69:22
**returns** 18:13
**review** 23:14,16
  28:18 30:10,14,15
  30:15,16 37:5,12
  37:19 57:2,17
**reviewed** 20:18,25
**reviewing** 39:21
**richard** 19:6,22
  65:8 72:7
**right** 9:19 22:8
  27:17 30:23 39:3
  43:15,18 46:2
  47:19 48:18 67:23

  74:9 75:24 76:10
  84:5,13
**rights** 5:2
**risk** 44:22
**road** 9:18,22,25
  26:22 79:23 80:24
  81:23 83:6,21
  84:11,12 85:6,7
**room** 7:3,8 44:4
**rpr** 89:22
**rules** 4:4 5:25 7:4
**run** 46:15,19 47:9
  80:15
**runs** 56:4
**rutkovsky** 1:5,15
  4:1,9,11 5:1,13
  6:1 7:1 8:1 9:1
  10:1 11:1 12:1,23
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1,19
  22:1 23:1 24:1
  25:1,7 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1,22
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1

[rutkovsky - stipulations]

82:1 83:1 84:1
85:1 86:1,20 87:1
87:6 88:1 89:11
90:25
**rye** 79:24 80:25

**s**

**s** 2:2 4:2 16:11
23:20 33:24,25
87:9 88:4
**sale** 69:18,19,21
69:25 70:4,8,20
71:2,20 72:21
73:2,13,24 74:4,8
76:10,11,13,17,22
76:24 83:22 84:18
**saw** 80:7
**saying** 53:12 54:12
**says** 31:11,11,21
51:22 56:4
**scan** 32:16
**schedule** 55:15,24
56:2,10 57:17
88:8
**scheduled** 36:16
**school** 13:22 14:9
14:11,12
**sealing** 3:5
**search** 16:14
**second** 26:11
**secretary** 53:11
**section** 56:19
**see** 22:18 25:21,21
52:14,20 55:6
56:2 84:6
**seeing** 51:9
**seek** 48:4 49:17,20
64:12
**seeking** 50:4 69:2
**seen** 21:19 39:22
39:24 40:2,6 41:4
59:24 79:10 81:17

**sell** 78:14
**selling** 72:14 74:11
84:24
**semi** 24:22,23
**sending** 60:9
**sense** 34:7
**sent** 29:3,8,9,10,10
29:24 54:8 81:24
**separate** 61:5
**separated** 11:11
11:15,16
**september** 55:22
73:15 83:19
**septic** 36:22 46:24
**serve** 68:16
**service** 16:17
**services** 15:24,25
16:2,7,13 18:13
37:11 38:8
**set** 36:6,8,9 56:4
56:11,21,22 57:4
84:18 89:12
**setback** 47:12 48:6
48:11
**setbacks** 47:2,22
**setting** 56:10
**seven** 69:11
**shape** 85:3
**share** 61:16,17
**sharon** 10:11 23:3
**show** 31:19 41:22
42:9 43:17,17,18
43:21
**shown** 27:18
**shrubbery** 27:7,12
**sic** 68:11
**side** 24:17,20
48:16
**sign** 68:15 76:11
76:17,22

**signature** 22:8,9,9
22:11,14 52:16
75:21 89:21
**signed** 3:12,14
77:16,17
**significance** 32:12
**similar** 81:7
**simple** 32:5 43:13
**simply** 54:24 55:4
60:25 70:18 83:18
**single** 51:25 54:10
**sips** 16:25
**sit** 29:22 38:7 65:3
**site** 38:5 56:21
**sited** 46:12
**siting** 36:20 46:25
**situated** 24:13
**six** 58:4 73:16
**size** 81:2,7,8
**skarzynski** 2:16
**skarzynski.com**
2:21
**slip** 30:21
**slope** 36:23 46:25
**sloped** 24:13
**smaller** 79:24 81:8
**sold** 60:13 61:13
80:8 81:2 82:15
83:10,12 84:3
**soliciting** 58:6
**solo** 20:3
**somebody** 68:22
71:14 74:4,8
**sorry** 13:11 17:25
30:2 45:9 46:4
50:13 57:12 76:15
**sound** 41:25
**south** 24:14,20
**southern** 1:3 4:21
21:14

**space** 45:20
**speak** 62:21
**speaking** 13:6
**specific** 23:25
32:25 47:15
**specifically** 75:14
**specifics** 9:16
**spell** 66:7 68:9
**spelling** 68:10
**spoke** 74:3
**spoken** 51:20 62:8
**sports** 34:2
**square** 43:3,6,9,13
44:3,4,6,8,23,25
45:3,10,15,20,23
46:5,7 85:14
**ss** 89:5
**stand** 5:9
**stanley** 4:5 8:23
9:9 11:9
**start** 8:2,2,20 51:7
58:12
**started** 71:9
**state** 1:20 14:5
21:13,18,25 22:5
47:21 86:25 89:4
89:10
**statement** 31:22
43:5 81:5,6
**states** 1:2 4:21
21:14
**stating** 4:5
**status** 69:17 83:6
83:20
**step** 33:3,11 35:13
**steps** 36:20,20
**stipulate** 28:7
**stipulated** 3:2,6,10
**stipulation** 55:3
**stipulations** 52:3
53:5 54:10,14,20

[stipulations - type]

55:2,7
**storm**  36:21 46:23
**story**  24:2
**street**  80:7
**strike**  33:11 62:11
  78:18
**structure**  24:16
  27:14,19 31:17
  33:5,9,10 38:23
  39:7,12 42:25
  46:11 48:16 51:18
  85:8
**stuck**  31:10
**style**  40:16
**subcontracting**
  58:10
**subject**  71:13
**submitted**  41:12
  50:13
**subpoena**  25:16
**subscribed**  86:22
**substance**  8:16
  70:17,24 71:3,10
  71:13,13,18
**success**  63:13
**suffolk**  89:6
**summarizing**  31:9
**summons**  21:7,16
  21:24 87:13
**supreme**  21:12,18
  21:25 22:4
**sure**  29:14,16,19
  29:21,22 32:18
  33:23 67:2 70:14
  85:16,17
**surgical**  63:15
**surprised**  53:25
**survey**  38:5
**sworn**  3:11,14 4:7
  86:22 89:13

**system**  36:23

**t**

**t**  4:2 33:24,25
  34:18 66:8 68:11
  86:14 87:9 88:4
**take**  6:14 7:7
  20:12 23:14 28:12
  32:15 42:13 57:25
  67:19 72:17 73:23
  85:24
**taken**  1:15 5:21
  26:23 67:20 86:2
**talk**  15:10 19:20
  20:16 75:14
**talking**  7:22 22:22
  26:15 31:20 32:2
  74:7
**tax**  18:13
**tcellilli**  2:21
**tear**  80:3,4
**technically**  13:6
  13:13 17:9
**tell**  6:21 26:20
  27:8 40:9 41:6
  47:14 51:7 56:7
  56:13 58:23,25
  59:16 61:9,20
  62:12 66:13,16
  70:3 75:10 77:9
  81:19
**telling**  61:25 62:3
**tendency**  7:14
**tennis**  33:23 34:2
**term**  9:13,24
  16:16 17:15
**testified**  4:8
**testimony**  26:5
  89:14
**thank**  27:22 58:20
  76:15

**thing**  6:16 7:21
  17:16
**things**  7:9 18:13
  20:25 37:23,25
  55:22
**think**  9:5 10:3,22
  15:3 17:16,17
  25:12 29:11 30:22
  32:9,11 36:10
  37:20 38:10 48:10
  49:3 56:12,18,22
  68:10 84:16
**thinking**  66:25
**thomas**  2:20
**thought**  29:24
  32:4 64:18 67:10
**thousand**  45:5
**three**  24:7 53:10
  53:14 54:3,11
  82:16
**time**  3:9 6:6,13
  7:23 12:5,12
  13:12,15 14:18
  29:4,13,15 31:6
  34:13 54:15 57:12
  58:5 60:18 61:7
  63:25 64:24 68:13
  74:14,15 76:20
  82:14 85:20
**times**  7:23
**tiny**  41:20
**tobin**  1:18 89:8,22
**today**  4:19 5:5 6:2
  6:21,24 7:4,8 8:12
  8:20 9:5 18:18
  19:20 20:17,19
  22:22 29:22 38:7
  43:11 65:3
**told**  49:15 61:15
  62:9 63:24 65:17
  65:21,22 71:14

86:4
**tom**  4:13
**top**  8:3 77:16
**total**  45:20
**town**  35:2 37:6
  41:12 49:7,13
  51:12 54:7,18
  79:24
**track**  25:14,25
**trades**  58:10
**transcript**  86:17
**transferred**  14:22
**trial**  3:9 5:3
**tricks**  30:20
**triggered**  48:25
  49:3
**trouble**  33:17
**trucked**  56:21
**true**  21:23 22:13
  23:18 28:19,23
  30:12 44:25 75:20
  89:13
**truth**  6:22,22,22
  86:5,5,6
**try**  9:6 30:3 32:23
  60:11 78:14
**trying**  27:13 30:20
  36:15 43:15 44:10
  63:13,17 73:18
**turn**  21:22 42:12
**two**  9:4 11:13
  20:25 26:21 31:6
  31:17 38:3 45:5
  51:5 52:12 53:10
  59:21 61:5 63:9
  63:25 64:3,5,14
  69:7,7 87:23
**type**  10:25 15:23
  16:2 17:6 18:6
  35:25 36:12 38:13
  38:22 39:5 57:3

69:5
**typing** 7:22

**u**

**u** 4:2,2 68:11
  86:14
**uh** 7:15,15,15
**understand** 6:7,11
  6:23 7:2 8:12,17
  9:8,14,25 18:24
  24:12 25:8 27:22
  33:6 36:14 37:9
  38:18 42:3 46:20
  46:22 48:23 50:8
  57:14 61:8 65:13
  65:14 70:5,15
  72:23 78:7 79:16
  82:11,22 83:3,12
  83:16,17 84:7
**understanding** 5:4
  9:17 32:11 48:12
  49:5 50:15 56:13
  56:25 57:16 67:22
  82:8
**understood** 6:10
  6:19 7:19 8:9
  26:17
**unit** 8:23 9:9
**united** 1:2 4:20
  21:14
**university** 14:16
  14:22 15:7
**upcoming** 19:15
  20:11
**use** 9:8,12,24 10:5
  17:15
**usually** 17:18,21

**v**

**v** 1:5,15 4:2,2,9
  5:9,9 86:20 87:5
  89:11 90:25

**vacant** 79:22
**valuable** 84:24
**value** 60:13 61:22
  84:16
**variance** 47:13,24
  48:2,4 49:10,18,21
  50:4,18
**variations** 59:22
**various** 65:10
**vegetation** 27:8,12
**vendor** 62:22,22
  62:23
**venues** 34:3
**verbal** 7:13
**version** 41:7,19
**versions** 40:11
**victor** 5:11,13
**village** 35:2 49:7
  51:12
**virtually** 46:13
**vlb** 1:9
**vs** 1:8

**w**

**waived** 3:5
**wall** 56:19,19
**want** 8:20 16:15
  29:22 31:10,19,25
  32:5 65:21 70:14
  70:25 83:23
**wanted** 26:14
**water** 36:21 46:23
  47:7,18,20
**way** 6:2 26:2 39:2
  46:11 76:8 89:17
**we've** 4:14,14
  39:19 40:22 55:21
  59:10 79:5 81:15
**week** 69:11
**weeks** 53:10,11
  54:12 78:5,11

**went** 29:16
**westchester** 9:18
  21:13,17 22:2,5
  45:17 80:15
**wetland** 47:5 48:9
  49:8
**wetlands** 47:21,21
  47:25 48:4,11
  49:2,10,17,21 50:4
  50:18
**whereabouts**
  10:17 14:7
**wife** 22:25 23:2
**wife's** 10:10
**witness** 30:19
  37:13 39:20 46:4
  55:10 87:4 89:11
  89:14
**wondering** 19:3
  83:10
**word** 9:8
**words** 33:23 60:13
**work** 18:6,9 20:3
  36:12 43:17,18
  49:5,9,12 58:9
  67:25 68:13 69:14
**worked** 16:23
  34:17 51:17 68:7
**working** 38:13
**works** 6:3
**workshop** 44:9
**world** 25:12
**worse** 9:13
**wrong** 29:14 48:13
**wrote** 55:23 63:11
  64:8

**x**

**x** 87:2,9 88:2,4

**y**

**y** 4:2 12:21 59:19
  66:8
**yeah** 14:19 45:4
  65:18
**year** 11:23 14:13
  14:25 31:6,17
  63:25 64:3,14
  73:19
**years** 12:14,21
  14:23 15:2 44:20
  44:20 53:15 54:3
  64:5 74:2 79:21
  80:11,25 84:11
  85:2
**yesterday** 20:13
**york** 1:3,17,20 2:8
  2:8,18,18 4:6,22
  8:23 9:10,18,22
  10:2,16 14:2,5
  21:13,15,18,25
  22:5 47:21 89:4
  89:10

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.